**JEWISH CENTER FOR AGED and JCA Support Co., Respondents,**

v.

**BSPM TRUSTEES, INC., and Pami Autumn, LLC, Appellants.**

No. ED 91965.

Missouri Court of Appeals,
Eastern District,
Division Two.

July 21, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 14, 2009.

Application for Transfer Denied
Nov. 17, 2009.

Jeffrey S. Heuer, Michael A. Clithero, Jill A. Wieber, St. Louis, MO, Gary Eisenberg, Newark, NJ, for Appellant.

Mark B. Leadlove, Mark H. Goran, James R. Wyrsch, Jr., Kenneth L. Marshall, Lawrence C. Friedman, Cheryl A. Kelly, St. Louis, MO, for Respondent.

## OPINION

GEORGE W. DRAPER III, Judge.

PAMI Autumn, LLC (hereinafter, "PAMI") and BSPM Trustee, Inc. (hereinafter, "BSPM" and referred to collectively as "Appellants") appeal from the trial court's judgment in favor of Jewish Center for the Aged (hereinafter, "JCA") and JCA Support Co. (hereinafter, "JCA Support") after a bench trial. Appellants raise five points on appeal. We affirm.

JCA is a benevolent corporation which owns approximately thirty-three acres of land in Town and County, Missouri. JCA operates a nursing home for the elderly and poor on approximately eight acres of that land. In the late 1990s, JCA planned to construct a new, 276–bed facility to replace their outdated nursing home. To that end, JCA sought approximately $60 million in financing to fund construction of the new facility. JCA ultimately applied for financing through the Department of Housing and Urban Development (hereinafter, "HUD") through a program commonly referred to as the Section 232 HUD Mortgage Program.

In order to obtain the best interest rate for the loan, JCA retained Gershman Investment Corporation (hereinafter, "Gershman") to process the HUD mortgage insurance loan application for JCA. Certain HUD regulations require all HUD-insured loan borrowers be "single asset mortgagors," which means the mortgagor cannot own any asset other than the facility being mortgaged under the HUD loan program. Since JCA wished to retain the undeveloped acres of land and other assets not connected with the new facility,

it could not qualify as a "single asset mortgagor." To rectify this situation, JCA's attorneys recommended JCA create a new entity that would borrow the funds from HUD. JCA, as owner of the land upon which the facility was being constructed, would lease the land to the new entity, and that entity would construct the new facility on that land and lease the facility to JCA since JCA was a licensed nursing home operator.

JCA Support, a not-for-profit corporation and wholly owned subsidiary of JCA, was incorporated on April 20, 2000, as that new entity. JCA Support was formed as a single-purpose entity, serving as the borrower from HUD. JCA Support had its own board of directors, officers, and maintained separate accounting from JCA. The corporations shared a mailing address, issued consolidated financial statements, and several of the members of the board and directors overlapped.

After JCA Support was formed, JCA and JCA Support worked with its attorneys, Gershman, and HUD to finalize the documents needed to implement the development plan. In the fall of 2000, Gershman submitted several documents to HUD for its review, including a Ground Lease, which is the focus of this litigation. HUD reviewed these documents and returned them with comments. The documents were revised over the course of the next few months.

On February 21, 2001, the parties closed the mortgage transaction to finance the construction of the new nursing home facility, and executed several documents. Initially, JCA and JCA Support executed the Ground Lease. Through this lease, JCA leased JCA Support the real property upon which the facility would be built in exchange for $1.00 rent annually. The Ground Lease contains several provisions, including JCA Support's duty that it "shall

act as the borrower for the development of a nursing home project initiated" by JCA on the real property. The Ground Lease also contained Section 26, the provision directly at issue in this case. Section 26 states:

> In the event of any default by [JCA Support] under a Leasehold Mortgage which [JCA Support] fails to cure within the time period allowed, without releasing [JCA Support] in whole or in part from the obligations to be performed by [JCA Support] thereunder, [JCA] may cure the default at [JCA Support's] sole cost and expense. Additionally, notwithstanding anything herein, [JCA] and [JCA Support] agree that, in the event of a failure of [JCA Support] to pay any amount due under the Leasehold Mortgage, and in the further event that HUD or any Leasehold Mortgagee determines to pursue any remedy under the Leasehold Mortgage, or the HUD Addendum which could affect the possession of the Real Property, [JCA] will be given notice ("Purchase Notice") of such failure to make payment and will have a first right to acquire [JCA Support's] leasehold interest together with the Improvements and other assets of [JCA Support] related thereto for a purchase price equal to the then fair market value thereof. [JCA] shall not be required to assume any liabilities of [JCA Support].... If [JCA] declines to exercise its option, HUD or any other Leasehold Mortgagee may declare [JCA Support] in default under the Leasehold Mortgage and may take any and all action permitted by such agreement and by law. [JCA] must give notice to [JCA Support] and to HUD and any other Leasehold Mortgagee of its intention to exercise its right to acquire the [JCA Support's] Leasehold interest pursuant to the terms hereof within thirty (30) days of receipt of the Purchase Notice

and shall thereunder have one hundred twenty (120) days to close the purchase. [JCA] and [JCA Support] agree to cause notice of this option to be placed of record.

The Ground Lease also contained a "HUD Addendum" wherein HUD amended the Ground Lease to include several HUD requirements into the document.

In connection with the Ground Lease, the parties also executed and recorded a Memorandum of Lease. This document expressly stated the memorandum was not a complete summary of the lease and did not supersede, modify, amend, or otherwise change the terms of the lease. The document stated in part, "The Lease includes provisions granting Tenant [JCA Support] certain rights, in the event of a default by Landlord [JCA] under any Leasehold Mortgage (as defined in the Lease), which may include the purchase [of] the premises which are the subject of the Lease."

JCA Support next executed a Deed of Trust Note (hereinafter, "the Note"). The Note established that JCA Support obtained financing to construct the new nursing home by borrowing $55.1 million through Gershman, which was in turn insured by HUD through the Section 232 HUD Mortgage Program as a non-recourse loan. HUD required all HUD insured mortgages to be first liens on the property securing the mortgage. JCA Support promised to pay the principal loan amount plus all interest accrued to Gershman as the holder of the Note. As security for the Note, JCA Support executed a Deed of Trust naming Bruce Sandweiss as trustee and Gershman as the beneficiary. The Deed of Trust encumbered JCA Support's rights and interests under the Ground Lease as security for the loan.

JCA and JCA Support also executed the Nursing Home Lease. This lease named JCA Support as the landlord and JCA as the tenant. Under the terms of this lease, JCA Support leased the new nursing home facility to JCA in exchange for JCA paying monthly rent to JCA Support in an amount equal to JCA Support's debt service obligation, plus interest, under the Note in the original amount of $55.1 million.

In late 2002 and 2003, JCA began encountering financial difficulties. The costs of operating the new nursing home facility were higher than projected in light of rising insurance premiums due to the events of September 11, 2001, a reduction in the federal supplement to the Medicaid program, and a cut in the Medicaid rate. The nursing home market in St. Louis also became more competitive as several new facilities opened or increased their capacity. In sum, the anticipated revenues could not cover the increasing operating costs.

In an effort to salvage the new facility, JCA and JCA Support consulted with HUD, Gershman, and Greystone Servicing Corporation, Inc. (hereinafter, "Greystone") to find a solution. Greystone suggested JCA cease paying its obligation to JCA Support under the Nursing Home Lease, and JCA Support cease payment on the Note. Both parties took this advice and stopped making payments in February 2005. On March 1, 2005, Gershman assigned its rights and interest under the Deed of Trust and the Note to Greystone.

After the parties ceased making payments, Greystone attempted to restructure JCA Support's debt obligation with HUD. On May 1, 2005, Greystone and JCA Support entered into a funding agreement whereby Greystone agreed to refrain from exercising any of its remedies under the documents connected to the HUD loan and not collect principal payments or interest due under the loan except for any month in which the facility demonstrated a positive projected cash flow. In the meantime, JCA and JCA Support also worked to reduce operating expenses for the facility in an attempt to stabilize their finances.

Greystone's efforts to restructure the debt continued through 2005 and the early part of 2006. Despite these efforts, Greystone was unsuccessful in negotiating a workout. On April 17, 2006, Greystone assigned its rights and interests under the Deed of Trust and the Note to the Commissioner of HUD. After all efforts to arrange a workout agreement proved futile, HUD announced it intended to sell the Deed of Trust and Note in a public auction scheduled for December 6, 2006.

After JCA received notice of HUD's intention to hold the public auction, JCA sent HUD a letter on December 1, 2006, reminding HUD of the provision in the Ground Lease with respect to its right to receive purchase notice prior to HUD taking any action to pursue a remedy which could affect possession of the property. That same day, JCA recorded a "Correction and Restatement of Memorandum of Ground Lease." In this document, JCA clarifies the confusion in the original Memorandum of Lease stating, "The Lease includes provisions granting [JCA] certain rights, in the event of a default by JCA Support under any Leasehold Mortgage (as defined in the Lease), which may include the purchase [of] the premises which are the subject of the Lease."

After HUD refused to give JCA purchase notice, JCA initiated litigation to enjoin HUD from selling the Deed of Trust and Note at the public auction and sought a declaratory judgment that HUD was required to give JCA purchase notice. JCA filed a similar action in federal district court. The district court granted JCA a temporary restraining order and HUD eventually removed the Deed of

Trust and Note from its auction. Ultimately, this suit was dismissed on sovereign immunity grounds in favor of HUD.

On September 17, 2007, HUD sold the Deed of Trust and Note for approximately $19 million to PAMI, a business entity that buys distressed debt. HUD subsequently assigned all of its rights and interests in the Deed of Trust and Note to PAMI. After PAMI purchased the Deed of Trust and the Note, it substituted BSPM as trustee in the Deed of Trust. In November 2007, PAMI sought to exercise its remedies as holder of the Note and scheduled a foreclosure sale of JCA Support's leasehold interest in December 2007.

On November 28, 2007, JCA and JCA Support filed this action for declaratory judgment and injunctive relief against Appellants. In its petition, JCA and JCA Support asked for a declaration that JCA was entitled to purchase notice in accordance with Section 26 of the Ground Lease and to be given a chance to exercise its rights pursuant to that provision prior to PAMI declaring a default and seeking foreclosure. JCA and JCA Support also sought an injunction to prevent Appellants from taking any action or pursuing any remedy that would affect possession of the real property prior to providing purchase notice.

JCA and JCA Support simultaneously requested a temporary restraining order, which the trial court granted after a hearing. In that same order, the trial court ordered JCA and JCA Support to post a $1.5 million bond.[1] After all the pleadings were filed, the parties consented to consolidate the preliminary injunction and permanent injunction hearings. A trial on the issues commenced on April 14, 2008. Appellants filed a request for written findings with respect to seven discrete issues.

After receiving two days worth of testimony and exhibits, the trial court rendered its judgment on June 6, 2008, granting JCA and JCA Support all of the relief it requested. Appellants subsequently filed a motion requesting the trial court direct JCA to pay them the cash flow generated by the operation of the new nursing home and for the appointment of a receiver to collect rents from JCA. The trial court denied this motion. Appellants appeal. To avoid repetition, additional facts will be set forth in our analysis of the points on appeal as needed.

■ Our Court reviews a bench-tried case under the standard set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Sutton Funding, LLC v. Mueller*, 278 S.W.3d 702, 704 (Mo.App. E.D.2009). We will affirm the judgment of the trial court unless it is not supported by substantial evidence, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Id.* "As the trier of fact, it is the trial court's function and duty to assess the weight and value of the testimony of each witness." *SE Co–Op Service Co. v. Hampton*, 263 S.W.3d 689, 692 (Mo.App. S.D.2008)(*quoting O'Dell v. Mefford*, 211 S.W.3d 136, 141 (Mo.App. W.D.2007)). We defer to the trial court's superior opportunity to assess the credibility of the witnesses. *Id.* We view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the trial court's judgment and disregard all contrary evidence. *Essex Contracting, Inc. v. Jefferson County*, 277 S.W.3d 647, 652 (Mo. banc 2009).

■ In their first point on appeal, Appellants claim the trial court erred when it

---

1. JCA's request that the bond be released is denied. JCA can request release of the bond when this Court issues its mandate in connection with this case.

concluded JCA's right to purchase JCA Support's leasehold interest as stated in Section 26 of the Ground Lease was superior to PAMI's property interest. PAMI argues it holds a first lien on JCA Support's leasehold interest as mandated by HUD regulations which require any HUD insured lien be a first lien. Moreover, PAMI insists JCA's enforcement of its rights pursuant to Section 26 would extinguish the first lien position held by PAMI.

Section 26 addresses the recourse the landlord, JCA, can take in the event JCA Support, the tenant, defaults under the leasehold mortgage. If JCA Support defaults on its obligation and the mortgagee determines to pursue a remedy that would affect possession of the real property, Section 26 states JCA shall be given "purchase notice" of the default. Further, JCA will have a first right to acquire JCA Support's leasehold interest, including the improvements related to the interest, namely, the nursing home facility, for a purchase price equal to the current fair market value. If JCA declines to exercise its right, then the mortgagee may pursue any remedy it wishes in the event of the default.

Section 26 constitutes a right of first refusal or right of preemption. Generally, "a right of first refusal, or preemptive right, requires the seller, when or if she decides to sell the stipulated piece of property, to first offer the property to the holder of the right, either at a stipulated price or at the price and on the terms the seller is willing to sell." *Schroeder v. Duenke*, 265 S.W.3d 843, 847 (Mo.App. E.D.2008). The person holding the right of first refusal or preemption cannot compel an unwilling seller to sell. *Lowery v. Air Support Intern., Inc.*, 982 S.W.2d 326, 330 (Mo.App. S.D.1998). Rather, once the seller chooses to sell, the holder of the preemptive right has the option of pur-

chasing the property in accordance with the agreement. *Allison v. Agribank, FCB*, 949 S.W.2d 182, 187 (Mo.App. S.D.1997). The right of first refusal is most frequently given in connection with the sale or lease of real estate. *Id.* at 187–88. "A right of first refusal that is contained in a lease is regarded as a covenant that runs with the land." *Megargel Willbrand & Co., LLC v. FAMPAT Ltd. Partnership*, 210 S.W.3d 205, 210 (Mo.App. E.D.2006).

We find the facts of this case analogous to the ones presented in *Nickels v. Cohn*, 764 S.W.2d 124 (Mo.App. S.D.1989). In *Nickels*, divorcing spouses executed a property settlement agreement with respect to the family's farm. *Id.* at 127. The wife agreed to quitclaim the farm to her husband subject to a covenant that if the husband wished to sell the property, he was to give their three sons notice of his desire to sell and offer the sons the right to purchase the property prior to sale. *Id.* The husband agreed, and a quitclaim deed evidencing their agreement and the sons' right to purchase the property was duly recorded. *Id.* In a complicated series of transactions, husband later mortgaged the farm and subsequently sold a tract of the farm to a third party without giving his sons notice or a chance to exercise their right to purchase the property first. *Id.* at 127–28. The husband later died and litigation ensued.

After determining the sons held a right of preemption, the *Nickels* court addressed a very similar argument to the one PAMI makes in this point. Specifically, the mortgagee in *Nickels* argued the covenants contained in the deed of trust were not the same as a mortgage, and therefore, its rights should not be subordinated to that of the sons' preemptive rights. *Id.* at 134. The *Nickels* court agreed that the right of preemption was not a mortgage, but found the sons' right of preemption

could be superior to the mortgagee's interest "without being an interest of the same order." *Id.* at 135. The *Nickels* court also rejected the mortgagee's contention because it determined the mortgagee had notice of the right of preemption because it was recorded properly. *Id.*

The analysis from *Nickels* is dispositive of this point. Section 26 contains a right of first refusal or preemption that is a covenant that runs with the land. This covenant was recorded. It is undisputed PAMI had notice of the provision prior to purchasing HUD's interest.[2] It is clear Section 26 is part of the leasehold estate on which PAMI retains a first lien. When JCA Support mortgaged its leasehold interest, that interest was subject to the provisions contained in Section 26. As such, JCA Support could only convey to PAMI the interest it held in that leasehold, and nothing more. *Nickels*, 764 S.W.2d at 135. Likewise, the fact that Section 26 is part of the leasehold estate does not mean PAMI's lien has been extinguished, but is merely subject to JCA's right of preemption. Therefore, the trial court did not err in concluding JCA's right of preemption was superior to PAMI's lien. Point denied.

■ In their second point, Appellants argue the trial court erred when it found JCA's purchase option remains enforceable because JCA has not received purchase notice from any party. Appellants claim letters sent by Greystone in July 2005 and by HUD in December 2005 and May 2006, met the notice requirements of the Ground Lease and constituted purchase notice pursuant to Section 26.

The Ground Lease contained a notice provision in the event a dispute arose between the parties. The Ground Lease required "notices, demands and requests which are to be given by Lessor, Lessee, the Mortgagee, or the Commissioner shall be in writing and shall be sent by registered or certified mail, post prepaid, and addressed to the address of the party as given in the lease." It is uncontested all three letters Appellants argue constitute purchase notice were sent via regular mail to an officer at JCA Support, at the office address JCA and JCA Support shared. The letters were hand delivered by the recipients to the president of the board for JCA. Neither JCA nor JCA Support directly responded to these letters.

The record supports the finding these letters did not comply with the notice provision contained in the Ground Lease in that they were not addressed to JCA and were sent via regular mail. However, it is undisputed JCA received the letters. Thus, despite Greystone and HUD's failure to comply strictly with the notice provisions of the Ground Lease, JCA had actual knowledge of the letters' contents. Yet, this is of no avail because the contents of the letters failed to constitute purchase notice.

■ The interpretation of a contractual provision is a question of law. *Wilson Mfg. Co. v. Fusco*, 258 S.W.3d 841, 844 (Mo.App. E.D.2008). "When interpreting any contract, a court must follow the terms of the contract as written if those terms are plain, unequivocal, and clear." *Vidacak v. Oklahoma Farmers Union Mut. Ins. Co.*, 274 S.W.3d 487, 490 (Mo.App. S.D.2008)(*quoting Muilenburg, Inc. v. Cherokee Rose Design and Build, L.L.C.*, 250 S.W.3d 848, 853–54 (Mo.App. S.D. 2008)). We will refrain from employing the rules of contract construction where

---

**2.** We recognize the original Memorandum of Lease which was recorded transposed the parties. However, it is undisputed the Memorandum was corrected and re-recorded approximately nine months before PAMI purchased the Note.

the contract by its terms is unambiguous. *In re Estate of Mackie,* 261 S.W.3d 728, 730 (Mo.App. W.D.2008).

Section 26 states JCA must be given purchase notice upon JCA Support's failure to pay the amount due on the leasehold mortgage and in the event the leasehold mortgagee pursues any remedy which could affect the possession of the real property. Appellants argue the letters sent by Greystone and HUD substantially complied with Section 26, and JCA let its option lapse by failing to respond to the letters. We disagree.

The first letter JCA Support received from Greystone's asset manager was dated July 19, 2005. This letter indicated JCA Support's loan "remains in default for failure to make the required payments due in accordance to the loan documents." The letter further stated JCA Support should remit payment "to avoid assignment of the mortgage to HUD...." Greystone informed JCA Support that should it fail to remit payment as requested, Greystone would apply for insurance benefits. Notably, this letter was sent shortly after Greystone and JCA Support entered into the funding agreement, which stated Greystone would refrain from exercising any of its remedies under the documents connected to the HUD loan and not collect principal payments or interest due under the loan except for any month in which the facility demonstrated a positive projected cash flow.

On December 22, 2005, HUD sent a letter to JCA Support. HUD stated it had received notice from JCA Support's mortgagee that the mortgage obligation was in default and advised JCA Support to cure the default immediately. HUD informed JCA Support that it had "policies designed to make it financially undesirable to have [the] mortgage assigned," one of which was that HUD "may begin the foreclosure process upon assignment."

HUD sent a second letter addressed to JCA Support on May 11, 2006. This letter stated Greystone had elected to assign JCA Support's mortgage back to HUD. HUD warned JCA Support "if this mortgage is assigned, HUD will put this mortgage into foreclosure immediately after the assignment has been completed." HUD gave JCA Support the option to avoid assignment and foreclosure by bringing the mortgage obligation current by paying all delinquencies immediately.

The trial court found the unambiguous terms of Section 26 established three things must occur before JCA had an obligation to exercise its right to acquire JCA Support's leasehold interest. First, JCA Support had to cease making payments under the leasehold mortgage. Second, the mortgagee must make a determination to pursue a remedy which could affect possession of the real property. Third, JCA must be given purchase notice in the form set forth in the HUD Addendum to the Ground Lease and first right to acquire JCA Support's leasehold interest.

When examining these letters, we find they fail to meet all three requirements. Clearly, all three letters state JCA Support is in default for failing to make payments on the mortgage. Yet, none of the letters assert Greystone or HUD is taking action that could affect possession of the real property. Each letter warns JCA Support of the possible consequences should it remain in default, but at no point did any of the letters state the mortgagee was taking affirmative action to pursue proceedings that could affect possession of the real property. Thus, these letters failed to constitute purchase notice pursuant to Section 26. Point denied.

In their third point, Appellants claim the trial court erred when it concluded no

credible evidence established JCA Support was the alter ego of JCA. Appellants believe undisputed facts demonstrate JCA exercised complete dominion over JCA Support's finances, business policy, and finances. JCA and JCA Support argue each corporation was maintained as a separate and distinct entity, in compliance with HUD regulations.

Our extensive review of the pleadings submitted in this case reveal Appellants failed to request any relief based on the alter ego theory, nor did they request the trial court pierce the corporate veil in order to hold JCA liable for JCA Support's debt obligation. It appears the only reason Appellants asserted an alter ego theory in this case was to demonstrate JCA received the three letters addressed to JCA Support, which they argued constituted purchase notice. We found JCA had actual notice and knowledge of the contents of the letters; however, these letters were insufficient to constitute purchase notice under the provisions of Section 26. Thus, it is inconsequential whether JCA Support was the alter ego of JCA in light of the deficiencies of the letters. Point denied.

In their fourth point, Appellants assert the trial court erroneously determined Section 26 required it to give JCA purchase notice in that neither HUD, nor PAMI via assignment, is a party to the Ground Lease. Appellants argue the Ground Lease cannot bind or impose obligations upon third parties that were not a party to the contract. As we stated with respect to Appellants' first point, the purchase notice requirement is a covenant that runs with the land. *Megargel Willbrand & Co., LLC,* 210 S.W.3d at 210. As such, the covenant is binding upon Appellants regardless of whether they were a party to the original lease. Point denied.

In their final point, Appellants challenge the trial court's denial of their request to appoint a receiver to collect rents owed to JCA Support by JCA because the Deed of Trust entitles PAMI to these rents in light of JCA Support's default. JCA and JCA Support believe the trial court's ruling was proper, in that by enforcing an assignment of rents clause, PAMI would have to take possession of the property, which triggers the purchase notice requirement of Section 26.

"The power to appoint a receiver is within the sound discretion of the trial court...." *Sangamon Associates, Ltd. v. Carpenter 1985 Family Partnership, Ltd.,* 165 S.W.3d 141, 146 (Mo. banc 2005). Rule 68.02(a) permits the appointment of a receiver when the trial court determines it "is necessary to keep, preserve and protect any business, business interest or property, including money or other thing deposited in court or the subject of a tender...." Further, the rule indicates the receiver has a duty "to keep, preserve and protect, to the extent and in the manner that the court may direct, that which the receiver is ordered to take into the receiver's charge." *Id.* "[A] receiver should be appointed only when the court is satisfied that the appointment will promote the interests of one or both parties, that it will prevent manifest wrong, imminently impending, and that the injury resulting will not be greater than the injury sought to be averted." *Sangamon Associates Ltd.,* 165 S.W.3d at 146 (*quoting Lynch v. Lynch,* 277 S.W.2d 692, 694 (Mo.App. K.C.Dist.1955)).

After the trial court rendered its initial judgment, Appellants filed a motion requesting the appointment of a receiver and payment of cash flow to collect rents, profits, and income generated by JCA's operation of the nursing home facility. In that motion, Appellants allege rent paid by

JCA to JCA Support must be assigned to PAMI as the holder of the Note and the beneficiary under the Deed of Trust executed by JCA Support. Further, Appellants explicitly stated in a footnote that nothing contained in their motion was intended to be construed as constituting purchase notice pursuant to Section 26. If the trial court deemed the appointment of a receiver to collect rents and profits would affect possession of the property under the Ground Lease, then Appellants requested the trial court deny its motion or allow them to withdraw it from consideration. The trial court denied Appellants' motion after a brief hearing.

The Deed of Trust contains two provisions that are relevant to PAMI's argument. Section 4 states, "all rents, profits, and income from the property covered by this Deed of Trust are hereby assigned to the Beneficiary for the purpose of discharging the debt hereby secured." Section 5 states, "upon default hereunder Beneficiary shall be entitled to the appointment of a receiver by any court having jurisdiction, without notice, to take possession and protect the property described herein and operate same and collect the rents, profits and income therefrom."

■■■■ "The general rule is that a mortgagee after default by a mortgagor has the right to possession of the mortgaged premises for the purposes of applying the rents and profits to the discharge of the mortgage debts." *Pine Lawn Bank and Trust Co. v. M.H. & H., Inc.*, 607 S.W.2d 696, 700 (Mo.App. E.D.1980). The assignment of rents clause contained within a deed of trust "does not by itself effect an absolute conveyance of rents to the assignee; something more must occur before the assignee activates the right to receive the rents." *In re South Pointe Associates*, 161 B.R. 224, 226 (Bankr.

E.D.Mo.1993). Missouri law requires the following steps be completed before an assignee is entitled to the assigned rents:

1. Proper documentation of the assignments;

2. Proper recording of the assignments in the form required for an interest in real estate;

3. Default on the part of the assignor; and

4. Possession of the premises by the assignee; or

5. Action equivalent to possession by the assignee.

*In re Stoneridge Apartments*, 119 B.R. 706, 707 (Bankr.W.D.Mo.1990).

■■■■ It is undisputed the assignment of rents clause has been documented, properly recorded by way of the Deed of Trust, and JCA is in default by its failure to pay rent to JCA Support. The only disputed issue is whether PAMI has taken possession or action equivalent to possession of the premises in order to perfect its assignment. PAMI argues it is not seeking to take possession of the property, but merely requesting an administrative receiver to collect rents and profits. While PAMI is not seeking to take actual possession of the real property, requesting the appointment of a receiver is "action equivalent to possession." *In re Mews*, 144 B.R. 867, 869 (Bankr. W.D.Mo.1992). The law is clear that the mortgagee has no entitlement to an assignment of rents until the mortgagee enters into actual possession of the property or takes action equivalent to possession. *See In re Northwest Commons, Inc.*, 136 B.R. 215, 218 (Bankr. E.D.Mo.1991); *In re Mews, supra*; *In re South Pointe Associates*, 161 B.R. at 226; *In re South Plaza Ventures*, 167 B.R. 535, 538–39 (Bankr. E.D.Mo.1994).

Since Appellants did not take possession or action equivalent to possession, they

failed to satisfy all of the criteria required to collect rent under its assignment of rents clause. Therefore, the trial court did not abuse its discretion when it denied Appellants' motion for the appointment of a receiver. Point denied.

The trial court's judgment is affirmed.

ROY L. RICHTER, P.J., and LAWRENCE E. MOONEY, J., concur.