Harold HANSEN, Respondent,

v.

W.K. HALLIBURTON and Halliburton
Financial Services, Inc.,
Appellants.

No. ED 93688.

Missouri Court of Appeals,
Eastern District,
Division Four.

Oct. 5, 2010.

Charles F. Durfour, Jr., St. Louis, MO, for Appellant.

Angela M. Redden–Jansen, St. Louis, MO, for Respondent.

ROBERT G. DOWD, JR., Judge.

W.K. Halliburton ("Halliburton") and Halliburton Financial Services, Inc. (collectively "HFS") appeal from the judgment in favor of Harold E. Hansen[1] ("Hansen") in the amount of $408,271.58. HFS alleges: (1) the trial court erred in concluding HFS failed to meet its burden of proof on its counterclaim; (2) the trial court erred in concluding that, exclusive of tax consequences, Hansen suffered $304,609.58 in damages as a consequence of Defendants' disbursement of $304,609.58 from Hansen's IRA accounts without his authorization or consent; (3) the trial court's judgment that the unauthorized disbursements from Hansen's IRA accounts made by HFS between April of 2002 and 2006 resulted in $103,662.00 of negative tax consequences for Hansen was not supported by competent and substantial evidence; and (4) the trial court erred in awarding Hansen $408,271.58 as a consequence of HFS's unauthorized disbursement of $304,609.58 from Hansen's IRA accounts. We reverse and remand.

In 1985, after the death of his wife, Hansen, a retired aerospace engineer, retained HFS for assistance with financial matters, including paying bills, filing taxes, and managing investments. The parties did not execute a written contract; however, in January of 1988 Hansen conferred a general power of attorney on HFS so they could file tax returns, sell real estate, pay bills, and otherwise conduct business on Hansen's behalf. Also, beginning in 1989, Hansen transferred his self-directed IRA accounts to HFS for them to manage.

HFS managed Hansen's affairs for many years. During this time, Hansen bought and subsequently sold a partnership interest in a partnership called B & H Partnership, which was created by Halliburton to construct an office building, the Edison Building, in the Chesterfield valley. Hansen also engaged in other investment opportunities and financial dealings, which included purchasing real estate and taking out loans. Hansen had taken out a loan with Mega Bank to pay for expenses associated with his partnership interest in B & H Partnership, but had subsequently become dissatisfied with Mega Bank. Hanson then went to HFS to seek assistance with ending his obligations to Mega Bank.

In 1989, HFS arranged to have Hansen take a loan from another client, Elizabeth Polczynski ("Polczynski"), for $107,248.41. This loan was secured by deeds of trust for three properties: 1163 Ashford Drive, St. Louis, Missouri 63137 ("the Ashford Property"), 1215 Bakewell Drive, St. Louis, Missouri 63137 ("the Bakewell Property[2]"), and 2424 Farnham Court, Florissant, Missouri 63033 ("the Farnham Property"). Around the same time, Hansen signed a promissory note signifying that he took a loan from HFS for $101,589.21, which was secured by the same properties. Hansen used the proceeds from his loans with Polczynski and HFS to pay off his loan with Mega Bank. Thus, the loans from Polczynski and HFS allowed Hansen to pay off his debt to Mega Bank, which was related to his partnership interest in B & H Partnership, but he remained indebted to Polczynski and HFS.

---

1. Hansen did not file a brief for this appeal.

2. In the transcript this property is referred to as the "Bankwell" property.

In April of 2002, the parties separated, and the power of attorney that Hansen had conferred upon HFS was formally terminated by mutual agreement. Hansen resumed control of his financial matters, but the record shows that from April of 2002 on, HFS continued to exercise control over Hansen's IRA accounts and to make distributions from those accounts to pay off over $200,000 in loans to Polczynski and HFS.

Hansen subsequently filed a petition against HFS and Polczynski. Hansen's petition included eight counts. The first six counts were against HFS and included: Count I to quiet title regarding three properties: the Ashford Property, the Bakewell Property, and the Farnham Property; Count II for an accounting; Count III for breach of trust and negligence; Count IV for fraud; Count V to set aside the transfer of partnership; and Count VI for co-mingling and conversion of funds. The remaining two counts were asserted against Polczynski and included: Count VII for money had and money received and Count VIII for conspiracy to commit fraud.[3]

HFS filed an answer in which it asserted numerous affirmative defenses. HFS also asserted a counterclaim, arguing Hansen was indebted to HFS on an unpaid promissory note, which was secured by the three properties and Hansen had defaulted on the note.

Thereafter a bench trial was held and both parties adduced evidence. Subsequently, the trial court entered its judgment. The trial court ruled against Hansen on Counts I, V, VI. Further, the trial court found the claim in Count II was moot. However, the trial court ruled in favor of Hansen on counts III and IV. The trial court noted it was clear that after Hansen revoked his power of attorney to HFS, HFS continued to make distributions from Hansen's IRA accounts when it had no authority, express or implied, to continue to do business or satisfy financial obligations on Hansen's behalf. Thus, the trial court held any and all distributions dating from April 2002 and made from Hansen's IRA account by HFS were done without authority and fraudulently, and Hansen's testimony regarding his authority was found to be credible. Further, the trial court found Halliburton's testimony regarding his authority was not credible, especially in light of the lack of any supporting evidence.

As to damages, the trial court found Hansen had incurred $103,662.00 in negative tax consequences from the unauthorized disbursement of proceeds from Hansen's IRA accounts. Further, the trial court found HFS had disbursed proceeds from Hansen's IRA accounts without authorization in the amount of $304,609.58.

In finding HFS failed to meet its burden on its counterclaim on an allegedly outstanding promissory note, the trial court noted it was unable to determine the validity of the parties' various notes and deeds of trust. More generally, the trial court noted it "was unable to determine exactly what transpired between the parties with regard to their real estate dealings, loan transactions, and limited partnership."

Thus, the trial court entered judgment in favor of Hansen and against HFS on Counts III for breach of trust and negligence and Count IV for fraud in the amount of $408,271.58. This appeal follows.

Our Court reviews a bench-tried case under the standard set forth in *Murphy v.*

---

**3.** Polczynski was never served with the petition. The trial court eventually dismissed the claims against Polczynski for lack of jurisdiction and dismissed Polczynski without prejudice.

*Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). *Jewish Center for Aged v. BSPM Trustees, Inc.,* 295 S.W.3d 513, 518 (Mo.App. E.D. 2009). We will affirm the judgment of the trial court unless it is not supported by substantial evidence, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Id.* As the trier of fact, it is the trial court's function and duty to assess the weight and value of the testimony of each witness. *Id.* We defer to the trial court's superior opportunity to assess the credibility of the witnesses. *Id.* We view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the trial court's judgment and disregard all contrary evidence. *Id.*

In its first point, HFS argues the trial court erred in concluding HFS had failed to meet its burden of proof on its counterclaim because HFS made a prima facie case for recovery on its counterclaim and Hansen failed to rebut its prima facie case with clear, cogent, and convincing evidence. We agree.

HFS contends a $101,589.21 promissory note dated June 27, 1989 and payable to HFS was introduced into evidence and that Hansen admitted to signing this note. Further, HFS alleged it showed through witness and documentary evidence there remained a balance of $65.495.80 on the note as of December 27, 2007. Hansen testified that he had signed the note, and had used the funds represented by the note to pay off the balance of another loan to Mega Bank.

In a suit on a note, the holder makes a prima facie case by producing the note admittedly signed by the maker and showing the balance due. *Sverdrup Corp. v. Politis,* 888 S.W.2d 753, 755 (Mo.App. E.D.1994). The burden is then upon the party against whom the note would be enforced to establish a defense by clear, cogent, and convincing evidence. *Id.* If the person against whom the note would be enforced fails to establish any defense, the holder is entitled to recovery. *Magna Bank of Madison County v. W.P. Foods, Inc.,* 926 S.W.2d 157, 161 (Mo.App. E.D. 1996).

In this case, HFS produced a note admittedly signed by Hansen and showing the balance due. HFS presented the testimony of Geraldine Kirchoff that there remained a balance of $69,425.55 on the HFS note as of June of 2009. Hansen presented evidence that in exchange for the loan from HFS, he executed deeds of trust in favor of HFS on three properties he owned: the Ashford Property, the Bakewell Property, and the Farnham Property. Hansen testified that the debts to Polczynski and HFS secured by these deeds of trust should have been paid off with the sale of Hansen's partnership interest in B & H Partnership in 1993. Hansen also asserted that unauthorized disbursements from his IRA accounts went to pay these same debts to Polczynski and HFS. The argument asserting Hansen's debts were extinguished with the sale of Hansen's partnership interest in B & H Partnership in 1993 has no support in the record. However, there is evidence that Hansen's debts were paid through disbursements from his IRA accounts.

As the trial court stated, it was unable to determine exactly what transpired between the parties with regard to their loan transactions, real estate dealings, and limited partnership. However, HFS made a prima facie case that it was owed money on the promissory note, and Hansen failed to produce substantial evidence that the note in favor of HFS was paid off either through the sale of his interest in B & H Partnership or through the unauthorized disbursements from his IRA accounts.

Therefore, we find the trial court erred in concluding HFS had failed to meet its

burden of proof on its counterclaim. We remand to the trial court to determine the amount owed by Hansen to HFS including any costs and for entry of judgment in favor of HFS on its counterclaim for that amount and for any other relief deemed appropriate. Point granted.

■ In its second point, HFS argues the trial court erred in concluding that, exclusive of tax consequences, Hansen suffered $304,609.58 in damages as a consequence of Defendants' disbursement of $304,609.58 in proceeds from Hansen's IRA accounts without his authorization or consent. We agree.

HFS contends the record establishes the $304,609.58 in proceeds from Hansen's IRA accounts was disbursed to make payments totaling $304,609.58 on the unpaid balances of promissory notes to Polczynski and HFS. Further, HFS asserts Hansen has retained the $304,609.58 benefit he received from the paying down of the two promissory notes. In essence, HFS argues because Hansen's funds were used without authorization to pay his own debts, the proper measure of damages is the total amount of unauthorized transactions minus the total amount of unauthorized payments from which Hansen received and retained a benefit. HFS asserts, under this measure of damages, Hansen was entitled to only $481.61, and that the trial court's award amounts to a double recovery.

■ In Missouri, a victim of fraud has a choice, he can either rescind the transaction, tender return of any benefits he obtained by the transaction, and seek judicial aid to recover the benefits he conveyed, or he can adhere to the transaction, retaining whatever benefits inured to him, and seek to recover in damages the difference in value between what he actually received and what he would have received had there been no fraud. *Rosenblum v. Jacks or Better of America West Inc.*, 745 S.W.2d 754, 764 (Mo.App. E.D.1988). In

other words, a victim of fraud can undo the transaction or he can obtain the benefit of the bargain, but he cannot do both. *Id.*

In this case, the trial court determined any and all distributions dating from April 2002 and made from Hansen's IRA account by HFS were done without authority and fraudulently, and Hansen's testimony regarding his authority was found to be credible. Further, the trial court found Halliburton's testimony regarding his authority was not credible, especially in light of the lack of any supporting evidence. Hansen testified he never gave HFS authority to make any disbursements after he revoked his power of attorney. Further, Hansen testified he did not realize these payments were being made. The trial court found Hansen to be credible regarding his lack of authorization.

However, HFS's argument is that even if it did not have authority to make the disbursements, the trial court's judgment has, in effect, given Hansen a double recovery. HFS asserts it made the disbursements, but the money went to pay down notes on which Hansen was indebted to Polczynski and HFS. Thus, Hansen recovers the disbursements, but he does not re-incur the indebtedness. For his part, Hansen contended in his testimony at trial that his indebtedness to Polczynski and HFS had been paid off when he sold his interest in the B & H Partnership in 1993, well before the unauthorized disbursements began. As mentioned earlier, there is no evidence in the record to support this assertion. However, there is evidence to show Hansen's debt was paid through unauthorized disbursement from his IRA accounts. As noted above, the trial court found it was unable to determine exactly what transpired between the parties with regard to their loan transactions, real estate dealings, and limited partnership.

However, the trial court's judgment resulted in him receiving the benefit of hav-

ing his debts at least partially paid off in addition to being repaid for the unauthorized disbursements that paid down those debts. Thus, Hansen improperly received a double recovery.

Therefore, we find the trial court erred in concluding that, exclusive of tax consequences, Hansen suffered $304,609.58 in damages as a consequence of Defendants' disbursement of $304,609.58 in proceeds from Hansen's IRA accounts without his authorization or consent. We remand to the trial court for a determination of the actual amount, if any, of Hansen's damages after deducting the benefits which inured to Hansen from the unauthorized disbursements. Point granted.

In its third point, HFS argues the trial court's judgment that the unauthorized disbursements from Hansen's IRA accounts made by HFS between April of 2002 and 2006 resulted in $103,662.00 of negative tax consequences for Hansen was not supported by competent and substantial evidence.[4] We agree.

HFS contends the calculations on which the trial court relied were insufficient because Hansen's expert witness, John Moroney ("Moroney"), admitted his calculations failed to take into account a variety of relevant factors. Further, Moroney's calculations included $11,272.00 in damages for tax years 2000 and 2001, which pre-dated the alleged unauthorized IRA disbursements. Moreover, HFS claims Hansen's damage estimate of $76,432.00 for tax year 2006 was demonstrably inaccurate and excessive in that it failed to credit Hansen for the $43,983.12 federal withholding tax payment HFS made on Hansen's behalf in July of 2006. Lastly, HFS claims Hansen did not show the negative tax consequences he suffered were incurred as a direct and proximate cause of HFS's actions.

Generally, damages need not be established with absolute certainty, but reasonable certainty is required as to both existence and amount, and the evidence must not leave the matter to speculation. *V.J.M. Associates, Inc. v. Gilmore*, 44 S.W.3d 440, 441 (Mo.App. E.D.2001).

In this case, Hansen's evidence only showed the "possible tax effects to certain transactions that could have been made." Further, when creating Exhibit 68, a summary of the tax effects Hansen incurred from 2000 through 2006, Moroney testified there were a lot of factors that went into the calculation of whether or not qualified mortgage interest was deductible and his estimation of the tax consequences failed to account for all of those factors. As a result, we find the evidence of negative tax consequences is too speculative and there is not competent support for the trial court's judgment on that count.

Therefore, the trial court's judgment that the unauthorized disbursements from Hansen's IRA accounts made by HFS between April of 2002 and 2006 resulted in $103,662.00 of negative tax consequences for Hansen was not supported by competent and substantial evidence. Point granted.

In its fourth point, HFS argues the trial court erred in awarding Hansen $408,271.58 as a consequence of HFS's unauthorized disbursement of $304,609.58 in proceeds from Hansen's IRA accounts.

This point was asserted in the alternative to HFS' second and third points. Because we have found in favor of HFS on those points, this point is rendered moot.

The judgment of the trial court is reversed and remanded. We remand to the

---

4. We note that during these years, Hansen's tax were prepared by his own accountant, not by HFS.

trial court to determine the amount owed by Hansen to HFS including any costs and for entry of judgment in favor of HFS on its counterclaim for that amount and for any other relief deemed appropriate. Further, we remand to the trial court for a determination of the actual amount, if any, of Hansen's damages from the unauthorized disbursements using the proper calculation for damages set out in this opinion. Lastly, we reverse the trial court's judgment that the unauthorized disbursements from Hansen's IRA accounts made by HFS between April of 2002 and 2006 resulted in $103,662.00 of negative tax consequences for Hansen.

KURT S. ODENWALD, P.J. and NANNETTE A. BAKER, J., concur.