WILL INVESTMENTS, INC., Danny
Street, and Catherine Street,
Plaintiffs–Appellants,

v.

Peter J. YOUNG, Defendant–
Respondent.

No. SD 29586.

Missouri Court of Appeals,
Southern District,
Division Two.

June 10, 2010.

Motion for Rehearing and Transfer Denied
July 2, 2010.

Application for Transfer Denied
Aug. 31, 2010.

Richard L. Schnake and Judson P. Poppen, Neale & Newman, L.L.P., Springfield, for appellants.

Donald L. Cupps, Ellis, Cupps and Cole, P.C., Cassville, Darlene F. Parrigon, Parri-

gon Law Office, L.L.C., Pierce City, for respondent.

GARY W. LYNCH, Presiding.

Will Investments, Inc., a Kansas corporation, Danny Street, and Catherine Street ("Plaintiffs") appeal the judgment of the Circuit Court of Barry County denying their claims for injunctive relief and damages for trespass against Peter J. Young ("Defendant") and reforming the language of an easement granted in favor of Defendant. Finding that the reformation of the easement was not in error and that it precludes the grant of affirmative relief to Plaintiffs on their claims, we affirm the trial court's judgment.

### Factual and Procedural Background

In 1962, Grover and Freda Renick purchased approximately thirty-five acres situated on a peninsula between the main channel of Table Rock Lake and Mill Creek in Barry County. Lake Road 39–9 runs north to south through the property and bisects the peninsula. The Renicks' property bordered the main channel on the east side and Mill Creek on its south side. In September 1999, the Renicks offered for sale a 10.25–acre parcel. Monte Goodman, a real estate broker with Goodman Realty in Shell Knob, represented the Renicks and listed this parcel for sale.

The 10.25–acre parcel was situated in an area without boat dock zoning adjacent to the property, as placement of a boat dock on the main channel of Table Rock Lake was not allowed. However, Mr. Renick was aware that zoning for a boat dock existed along the shoreline of Mill Creek on the south side of his property. In order to entice a prospective purchaser desiring a boat dock, the Renicks were prepared to grant an easement for boat dock access on the southern portion of their property, "across the road and south,

within a quarter of a mile of" the 10.25 acres. Mr. Renick instructed Goodman to "investigate getting a boat dock." However, Mr. Renick instructed Goodman to try to sell the property without having to provide such an easement, if possible.

Goodman investigated the procedures necessary to acquire a permit from the Army Corps of Engineers ("Corps") for the placement of a boat dock along the shoreline of the property bordering Mill Creek. Dock zoning for a community boat dock was available along approximately 400 feet of shoreline on Mill Creek, proximate to the area where the Renicks' remaining property was situated. The Corps refers to such a zone as a "red zone." According to permit requirements, community docks must provide a minimum of twelve stalls and can have no more than twenty. The dock must be placed perpendicular to the shoreline and at least 100 feet away from any other dock. In this location, the Corps' regulations required "[p]roof of access and parking on private property within 200 [feet] from the 915 msl (mean sea level) elevation" to the government fee take line ("GFTL"). However, this requirement may be waived, as it was for Defendant here, where the distance is greater than 200 feet if access and parking can be located on private property directly above the dock site being considered. At a minimum, one parking area—10 feet by 20 feet—for every three boat slips on the dock is required.

Mr. Renick set forth the dimensions of an easement utilizing the known Corps markers as shown on a drawing of the plat. He sketched the boundaries of an easement extending approximately 200 feet westward from the roadway across the Mill Creek side of the property then owned by the Renicks and south of the 10.25 acres offered for sale. The easement measured 25 feet in width at the roadway

on the east, continued at that width westward, and then flared to a width of 50 feet at the GFTL. Mr. Renick believed these dimensions would accommodate parking and meet the minimum requirements to allow for the placement of a community boat dock immediately adjacent to the easement.

In a letter dated March 26, 2000, the Renicks informed Goodman of the terms of the easement they were proposing to grant "for the purpose of locating a boat dock." Along with the letter, the Renicks sent the sketch of the easement they proposed to grant. The letter provided that "[t]he easement would be 25 feet wide and approximately 200 feet long with 50 foot lake frontage." It was also stated that "[t]he longest dimensions of the dock must be perpendicular to the lake shore line." The Renicks further indicated that they "would be interested in buying one or maybe two slips in this new dock."

In February 2004, Defendant contacted Goodman about purchasing the 10.25–acre parcel. Within a few weeks, Defendant made an offer to purchase the parcel, as well as the "boat dock easement on Section 22 owned by seller[.]" Defendant wanted the easement as part of the transaction so that he could place a community dock adjacent to the easement. Attached to Defendant's offer was a copy of Mr. Renick's sketch of the easement Mr. Renick provided to Goodman Realty, labeled "Dock Zoning Easement."

After the Renicks accepted Defendant's offer to purchase, Monte Goodman took the contract and Mr. Renick's sketch of the easement to Richard Asbury, of Asbury Land Title Company, who ultimately drafted the language of the easement and the warranty deed, and the easement was incorporated into the warranty deed when the property sold. The reference to the easement in the warranty deed between Defendant and the Renicks included the following language: "Together with an easement for ingress and egress to dock area over and across the following described tract[.]" On March 29, 2004, Asbury Land Title closed the transaction between Defendant and the Renicks.

After closing, Defendant employed Austin Survey to survey and flag the easement. No further work was performed on the easement until late April or early May 2006, at which time Defendant employed Bob Stewart of Lakeshore Construction to clear trees and install a culvert on the easement.

Apparently, at the same time the Renicks listed the above-referenced 10.25 acres with Monte Goodman, they also had listed with another realtor, Jennifer Busen, from Kimberling Hills Realty, a 24–acre parcel situated south of the 10.25 acres that Defendant purchased. This parcel did not sell for some time, and at some point, Ms. Busen ceased to represent the Renicks in their attempt to sell.

In mid-January 2005, Mike Fitzpatrick, a self-employed marina contractor who was interested in developing property around the lake, contacted Busen to determine if the remaining southern portion of the Renicks' property was for sale. Fitzpatrick initially partnered with Danny Street, a contractor, and his wife, Catherine, in planning a residential development, Mill Creek Landing, which included at least one community dock. Fitzpatrick later introduced Danny Street to Chuck Singleton, who ultimately joined in the endeavor after Fitzpatrick bowed out. Singleton was sole owner of Will Investments, Inc., a plaintiff herein. Although no longer a principal in the development, Fitzpatrick continued to assist in the acquisition of the real estate.

At the time Fitzpatrick contacted her, Busen no longer represented the Renicks, but she contacted them with information that she had an interested purchaser and obtained a new listing from them. The Renicks dealt only with Busen and had no contact with Fitzpatrick, the Streets, or Singleton. Mr. Renick informed Busen of the sale of the 10.25 acres to Defendant and the easement burdening the parcel that Plaintiffs wanted to purchase. He provided to Busen a copy of the drawing and the easement and discussed the fact that there was an easement " '[t]o get through it,' that he had sold some land to another guy." Busen could not remember if she showed the drawing to Fitzpatrick and had "no idea" if a boat dock was discussed, but she was sure that he knew of the easement, and "[Fitzpatrick] didn't have a problem with it." Busen further stated that she communicated only with Fitzpatrick and never met Street or Singleton.

After Busen informed Fitzpatrick of the easement granted to Defendant, Fitzpatrick shared that information with Singleton and the Streets. In an attempt to learn whether the easement as granted would allow for Defendant's placement of a community boat dock, Fitzpatrick spoke with a Corps duty ranger and discussed the language of the easement, particularly in reference to the "ingress and egress" provision, and the easement drawing. Plaintiffs were concerned about whether the language of the easement would allow parking rights, as access for parking is necessary to meet the Corps' requirements for approval of a community dock. Parking rights are not required for private boat docks. Believing that the language of the easement would not permit parking, Fitzpatrick reported back to Street and Stapleton that they could move forward with their purchase of the property.

Fitzpatrick and Danny Street personally inspected the site of Defendant's easement and measured from the GFTL at the north corner to the shoreline along Defendant's easement. Plaintiffs intended to place their dock "immediately in front of the boundary line between the Mill Creek Landing easement and [Defendant's] easement." The admitted intent of this placement was to prevent Defendant from placing a dock within a distance of 200 feet from his easement; placement of a dock at any greater distance, they believed, would not be approved by the Corps.

Danny Street admitted that prior to Plaintiffs' purchase of the property from the Renicks, he was aware of the easement language and had seen Defendant's warranty deed, in addition to "a drawing showing the location of the easement," which was labeled "Dock Zoning Easement" at the top. Street further admitted that he saw the March 26, 2000, letter from the Renicks setting forth the details for the easement before the transaction closed. In this letter from the Renicks to Goodman Realty, the Renicks state, in part: "Enclosed is my drawing showing the easement we discussed earlier pertaining to the prospective buyers of a nearby parcel of real estate. The location is almost flat and should be ideal for their gaining access to the [GFTL] for the purpose of locating a boat dock. The longest dimension of the dock must be perpendicular to the lake shore line." In closing, the Renicks further stated, "We would be interested in buying one or maybe two slips in this new dock." Street also had experience with the development of another community dock in addition to the one Plaintiffs installed at Mill Creek Landing.

Singleton testified that before closing on the Plaintiffs' property, he saw the language of the easement on the deed between Defendant and the Renicks and had

seen a copy of the sketch setting forth the shape of Defendant's easement. He never talked to the Renicks, Defendant, or Goodman to inquire further. He relied on the "easement for ingress and egress to dock area" language, knowing from previous experience as both a community dock owner and a private dock owner that a "parking easement" for additional owners of slips was necessary.

The transaction for the sale of the twenty-four acres between the Renicks and Will Investments, Inc., Danny Street, and Catherine Street was closed March 31, 2005, through Asbury Land Title. Plaintiffs subdivided the property into sixty-six lots and further planned to build three parking lots and install three community boat docks.

Plaintiffs applied for a community dock permit and received approval to install one 20–slip community dock. Plaintiffs' dock was delivered in April or May 2006. Plaintiffs placed their dock "directly in front of both easements, leaving a situation to where another dock placed by someone else would [require] an access directly across Corps property, increasing the distance way more than 200 feet, which [Plaintiffs] knew the [Corps] would not allow." Plaintiffs intended to obstruct Defendant's placement of either a community dock or a private dock.

During the same time period, Defendant made an initial payment on a 14–slip dock on January 2, 2006. His application for a boat dock permit with the Corps was submitted January 27, 2006. Approval was granted February 22, 2006, after the Corps waived the requirement that Defendant's dock be placed within 200 feet of the easement. This dock was installed around Memorial Day 2006. Soon thereafter, Defendant and other slip owners utilizing Defendant's dock were parking in the easement.

Defendant received a letter on June 12, 2006, from Jeffery Goodnight who represented Will Investments, Inc., alleging that Defendant's clearing of the easement "was an excessive use of [his] easement for ingress and egress." Goodnight further requested that Defendant immediately "cease and desist destroying trees and other fixtures along the easement, and ... that [Defendant] put the property back into the shape it was prior to the grant of the easement[.]"

Another attorney, Judson Poppen, who represented Plaintiffs, wrote to Cheryl Wanko at the Little Rock District of the Corps, on June 29, 2006. Therein, Poppen advised that Plaintiffs had retained his firm to represent them in their dispute with Defendant and requested that the Corps "reconsider its permitting decisions with respect to [Defendant]," in light of their belief that pending litigation would preclude Defendant from the ability "to provide parking on private property near the dock area—a Corps of Engineer requirement for obtaining a boat dock permit."

On June 30, 2006, Plaintiffs filed the underlying action for injunctive relief and damages against Defendant, alleging in part trespass, in that Defendant's use of an easement across property owned by Plaintiffs exceeded the scope of the easement and was unreasonable. Plaintiffs further sought a temporary restraining order, a preliminary injunction, and a permanent injunction to preclude Defendant from further activities on the easement. Defendant answered and later amended his answer, asserting affirmative defenses of laches, equitable estoppel, and unclean hands, and counter-petitioned for reformation of the language of the easement at issue to conform to the actual intentions of the parties.

In his counter-petition, Defendant alleged that after Plaintiffs' purchase of the property from the Renicks, Plaintiffs claimed restrictions on the easement granted by the Renicks to Defendant, and further, "[i]f the Plaintiffs' interpretation of the easement language is incorrect then the description . . . of the easement intended to be conveyed was incomplete, and in fact does not adequately describe the easement conveyed to Defendant." Defendant claimed that the language of the easement "was incomplete due to scrivener's error and mutual mistake of the parties to the deed and should have specifically included the right to construct a parking area and park vehicles on the easement so as to leave no doubt as to the extent of the agreement of the parties." He proposed the following reformation of the language of the easement at issue: "Grantors grant the Grantees and his heirs, assigns, servants, agents, licensees and invitees a perpetual easement for ingress, egress and parking for access and utilization of a boat dock(s) and the boat dock area."

Following a bench trial, the trial court entered judgment in favor of Defendant and against Plaintiffs on Plaintiffs' claims in their petition and, in accordance with Defendant's counter-petition, ordered reformation of the language of the easement. The trial court determined that the language of the easement granted by the Renicks to Defendant is vague, ambiguous, and incomplete, and that the easement's grantor and grantee intended that Defendant and his assigns have the right to utilize the easement to support a community boat dock, including parking rights. Finding that there was a mutual mistake in that the language of the easement in the warranty deed did not adequately describe the easement intended to be conveyed to Defendant, the trial court ordered that the warranty deed "is reformed to read as follows: Grantors grant the Grantees and his heirs, assigns, servants, agents, licensees and invitees a perpetual easement for ingress, egress and parking for access and utilization of a boat dock(s) and the boat dock area."

This appeal timely followed. Plaintiffs present seven points relied on. Their seventh point is dispositive.[1] In this point, Plaintiffs contend that the trial court erred in reforming the language of the easement granted in Defendant's deed and in broadening the scope of the use of the easement,

---

1. Under Points I and II, Plaintiffs allege that the trial court's finding that Plaintiffs failed to meet their burden of proof on claims for injunctive relief and damages for trespass was unsupported by the evidence (Point I) and erroneously declared or applied the law (Point II), in that Plaintiffs proved that Defendant exceeded the scope of his easement for ingress and egress by parking on the easement and allowing others to park. Plaintiffs, in Point III, challenge the trial court's ruling that Plaintiffs are equitably estopped to assert their claims because Plaintiffs had actual knowledge of Defendant's intentions to place a community dock proximate to his easement and their silence amounted to concealment of a material fact. In Point IV, Plaintiffs assign error to the trial court's ruling that Plaintiffs' claims are barred by the doctrine of laches, in that they delayed filing their action alleging trespass "until Defendant began and/or completed the construction of his boat dock and parking area." Plaintiffs claim under Points V and VI that the trial court erred in ruling that their claims are barred by the doctrine of unclean hands because Plaintiffs had knowledge of the existing easement when they purchased their property and nevertheless sought to limit Defendant's use of the easement in order to deprive Defendant of a boat dock (Point V) and further attempted to place their dock in a location proximate to Defendant's easement to prevent the installation of Defendant's dock (Point VI). As conceded by Plaintiffs' counsel during oral argument, the reformation of the easement in accordance with Defendant's counter-petition, which Plaintiffs unsuccessfully challenge in Point VII, necessarily precludes the grant of any relief on Plaintiffs' claims.

in that Plaintiffs were bona fide purchasers of their property without notice of the intentions of Defendant and the grantors of the easement. Plaintiffs contend that they exercised due diligence in their attempt to discover the scope of Defendant's intended use of the easement in accordance with the language of the easement as recorded.

### Standard of Review

This Court will affirm the judgment of the trial court unless there is no substantial evidence to support it, the judgment is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). "In determining whether the judgment is supported by substantial evidence, we view the evidence in the light most favorable to the judgment and defer to the trial court's credibility determinations." *Barrows v. Firstar Bank,* 103 S.W.3d 386, 390 (Mo.App.2003). "Further, we grant the respondent the benefit of all reasonable inferences favorable to the judgment and disregard all contrary inferences and evidence." *Id.*

### Analysis

■ In its judgment the trial court found that "[t]he Plaintiffs had actual knowledge of the intended extent of the easement prior to purchasing the servient property." Nevertheless, Plaintiffs allege in Point VII that certain facts "show that Plaintiffs had no knowledge that by using the words 'an easement for ingress and egress to dock area over and across' actu-

ally served to grant Defendant the right to park on the easement and allow others to park." Plaintiffs claim that they "investigated the easement," in that "[t]hey considered the easement language and physically looked at the ground where the easement was located." Furthermore,

> [t]he trial court's finding that 'Plaintiffs had actual knowledge of the intended extent of the easement prior to purchasing the servient property' ..., is unsupported by the evidence or is against the clear weight of the evidence.[2] There is no evidence, let alone clear and convincing evidence to justify vitiating the assumption upon which Plaintiffs based their purchase of the property—that the easement did not permit parking, and hence it would not support a community dock. Plaintiffs should be able to rely on the state of the title as it appears in the recorded land records. The judgment reforming the easement grant should be reversed.

■ " 'Reformation of a written instrument is an extraordinary equitable remedy and should be granted with great caution and only in clear cases of fraud or mistake.' " *Ethridge v. Tierone Bank,* 226 S.W.3d 127, 132 (Mo. banc 2007) (quoting *Morris v. Brown,* 941 S.W.2d 835, 840 (Mo.App.1997)). " '[R]eformation is a remedy by which a party to a contract ... may obtain modification of the terms of the contract such that those terms reflect the parties' original intent in forming the contract.' " *Brown v. Mickelson,* 220 S.W.3d 442, 448 (Mo.App.2007) (quoting *Lunceford v. Houghtlin,* 170 S.W.3d 453,

---

**2.** Plaintiffs raised their against-the-weight-of-the-evidence argument for the first time in the argument section under Point VII in their brief. It is not raised in their point relied on. "We need not consider arguments not raised in the point relied on." *Eltiste v. Ford Motor Co.,* 167 S.W.3d 742, 750 (Mo.App.2005). Even if we ignored this requirement and con-

sider it, Plaintiffs fail to develop this argument any further after it is raised. "An argument should show how the principles of law and the facts of the case interact." *Boyd v. Boyd,* 134 S.W.3d 820, 824 (Mo.App.2004). Where an appellant fails to develop an argument, we consider it abandoned. *Id.*

464 (Mo.App.2005)). "Equity will reform an instrument which, through mutual mistake of the parties, does not accurately set forth the terms of the agreement actually made or which does not incorporate the true prior intentions of the parties." *King v. Riley*, 498 S.W.2d 564, 565 (Mo.1973).

"A mutual mistake occurs when both parties, at the time of contracting, share a misconception about a basic assumption or vital fact upon which they based their bargain." *Husch & Eppenberger, LLC v. Eisenberg*, 213 S.W.3d 124, 134 (Mo.App.2006) (quoting *Alea London Ltd. v. Bono–Soltysiak Enterprises*, 186 S.W.3d 403, 415 (Mo.App.2006)). "This is normally a question of fact." *Id.* "In a bench-tried case such as this, the trial judge is the finder of fact." *Kerr v. Jennings*, 886 S.W.2d 117, 125 (Mo.App.1994). "[T]o establish a mutual mistake in an instrument, it is not necessary to show that the parties theretofore had agreed upon any particular words or language to be used in the instrument, but it is sufficient to show that they agreed to accomplish a particular object by the instrument to be executed and that such instrument, as executed, is insufficient to effectuate their intention." *Allen v. Smith*, 375 S.W.2d 874, 880 (Mo.App. 1964).

Trial "court[s] can reform a written instrument only upon clear, cogent, and convincing evidence that leaves no room for reasonable doubt." *Cardinal Partners, LLC v. Desco Investment Co., L.L.C.*, 301 S.W.3d 104, 110 (Mo.App.2010). "This degree of proof relates not only to the existence of a mutual mistake, but also to establishment of the actual agreement allegedly made." *Id.*

The "party seeking reformation must show that: (1) a preexisting agreement between the parties affected by the proposed reformation is consistent with the change sought; (2) a mistake was made in that the deed was prepared other than as agreed; and (3) the mistake was mutual, i.e., it was common to both parties." *Id.* Mr. Renick, Defendant, and the realtor who brokered the sale all agree that the parties intended that the easement at issue provide access to the lakeshore, accommodate parking sufficient for five vehicles, and comply with the Corps' requirements for the placement of a community boat dock. The trial court found that Defendant met this burden, and Plaintiffs do not challenge that finding in this appeal. Indeed, Plaintiff's point does not challenge this finding of the trial court, but rather, assumes it to be correct.

Nevertheless, Plaintiffs assert that "the evidence shows that Plaintiffs were *bona fide* purchasers of their servient property without notice of the secret intentions of the Renicks and Defendant," and such status defeats reformation of the easement. Plaintiffs cite to *Lacy v. Schmitz*, 639 S.W.2d 96, 99 (Mo.App.1982), which holds that "[i]t is settled that 'no reformation will be granted against a bona fide purchaser *without* notice of the facts.'"

"A 'bona fide purchaser' is one who pays a valuable consideration, has no notice of outstanding rights of others, and who acts in good faith." *Community Bank of Chillicothe, Missouri v. Campbell*, 870 S.W.2d 838, 842 (Mo.App.1993). "The party claiming to be a bona fide purchaser bears the burden of proving those elements by a preponderance of the evidence." *Brown*, 220 S.W.3d at 452.

The record supports that Plaintiffs purchased their parcel from the Renicks for approximately $465,000.00. Accordingly, Plaintiffs paid a valuable consideration in exchange for the property they purchased. The record, however, does not support the elements of lack of notice or good faith.

"The notice sufficient to defeat a claim to bona fide purchaser status is actual or constructive notice of facts that would place a reasonably prudent person upon inquiry as to the title he or she is about to purchase." *Evans v. Wittorff,* 869 S.W.2d 872, 876 (Mo.App.1994). "[T]he grant of an easement need not declare a specific purpose." *Hoelscher v. Simmerock,* 921 S.W.2d 676, 679 (Mo.App.1996). "A person who purchases land with knowledge or with actual, constructive, or implied notice that it is burdened with an easement in favor of other property ordinarily takes the estate subject to the easement." *Nolte v. Corley,* 83 S.W.3d 28, 33 (Mo.App.2002).

While the easement granted to Defendant was not excepted in the warranty deed from the Renicks to Plaintiffs, Busen had received a copy of Mr. Renick's sketch of the easement which she showed to Fitzpatrick "early in the game." Plaintiffs obtained a copy of the warranty deed between the Renicks and Defendant, which included the following language in reference to the easement at issue: "Together with an easement for ingress and egress to dock area over and across the following described tract[.]" This deed also contained a legal description of the easement setting forth its shape and, more particularly, that it flared from 25 feet in width to 50 feet in width near the GFTL. Plaintiffs likewise viewed Mr. Renick's sketch of the easement before they purchased their property. Defendant had a surveyor stake out the easement in 2004 before Fitzpatrick and Danny Street physically inspected the easement in 2005, which was before Plaintiffs purchased their parcel. Plaintiffs do not claim that they were not on notice of the exact location, size, or shape of the easement or that the easement's purpose was to allow Defendant to have and maintain a boat dock. Rather, Plaintiffs contend that there was no substantial evidence that they had notice that the easement would allow parking as required by the Corps to support the maintenance of a community boat dock by Defendant. We disagree.

Fitzpatrick took the information he obtained from Busen and met with Cheryl Wanko, a duty ranger with the Corps in Branson, showed her the easement, and asked her if it would be accepted as an easement for a community dock. It is reasonable to infer that Fitzpatrick would not have taken this action unless he had knowledge and was on notice that the size, shape, and location of the easement might support a community boat dock.

Similarly, Danny Street's and Singleton's knowledge of the size, shape, and location of the easement, coupled with their previous experience with boat docks, put them on notice that Defendant's easement might support a community boat dock. Plaintiffs claim that the specific wording in the deed granting the easement only put them on notice that the easement was for ingress and egress, yet they offer no explanation for their knowledge of the legal description in the deed that described the easement with a flare toward the GFTL. The trial court could have reasonably inferred that the flare to a width of 50 feet at the GFTL put Plaintiffs on notice that the Renicks and Defendant intended some purpose for the easement in addition to just ingress and egress, which could have been accomplished with a rectangular easement only 25–feet wide. It was also reasonable for the trial court to infer that the additional purpose was for parking in the flare.

Danny Street had knowledge of the contents of the March 26, 2000, letter from Mr. Renick to his realtor, which was the basis for the agreement between the Renicks and Defendant. This letter stated

that "[t]he longest dimension of the dock must be perpendicular to the lake shore line" and that the Renicks "would be interested in buying one or maybe two slips in this new dock." As a private boat dock can have no more than two boat slips, neither of these statements have any meaning outside the context of a reference to a community boat dock. Combined with Plaintiffs' prior experience with both private and community boat docks, the trial court could have reasonably inferred that this knowledge put Plaintiffs on notice that the Renicks and Defendant contemplated an easement that would support the Corps' requirements for a community boat dock, including parking.

"If there are circumstances which in common reason and prudence ought to put a party to particular inquiry and by which inquiry he [or she] could have discovered the facts, the party is not considered a purchaser without notice." *Walters v. Tucker,* 308 S.W.2d 673, 675 (Mo.1957). Here, Plaintiffs purchased their property from the same sellers who granted Defendant the easement. Given Plaintiffs' knowledge of the circumstances surrounding the creation of that easement, Plaintiffs could have easily asked the Renicks prior to their purchase about the easement granted to Defendant that ran through their prospective property and, specifically, whether it was intended to include the right to park and was otherwise intended to support a community boat dock. Moreover, Plaintiffs could have made the same inquiry of Defendant.

Plaintiffs' failure to so inquire gives rise to a reasonable inference that they chose to be willfully blind as to the actual intentions of the Renicks and Defendant related to the easement and, thus, did not act in good faith. This inference is buttressed by their later action in placing their boat dock in such a manner as to obstruct any attempt by Defendant to place his dock in the approved area.

The above facts provide substantial evidence that at the time Plaintiffs purchased their property they had notice that Defendant's easement, even in the absence of a specific provision for parking, would accommodate a community boat dock that required parking and supports the trial court's finding that "Plaintiffs had actual knowledge of the intended extent of the easement prior to purchasing the servient property." Therefore, Plaintiffs failed to carry their burden in establishing their status as bona fide purchasers. Plaintiffs' Point VII is denied.

### *Decision*

The trial court's judgment is affirmed.

Judge SCOTT, C.J., and CORDONNIER, Sp. J., concur.