**Kurt THOMPSON, Successor Trustee of the Joseph O'Connor and Mary O'Connor Trust Dated April 13, 2002, Respondent,**

v.

**Amber Crowley KOENEN, Respondent;**

**Shaina Crowley, Caitlynn Crowley, Cassandra Crowley; Appellants;**

**Randy G. Crowley, Jr., Respondent.**

**No. WD 74549.**

Missouri Court of Appeals,
Western District.

March 26, 2013.

430

Stephen K. Griffin, for Respondent Kurt Thompson, Cameron, MO, for appellant.

William M. Quitmeier, for Shaina, Caitlynn and Cassandra Crowley, Kansas City, Mo; Arthur A. Benson, II for Amber Koenen, Kansas City, MO; and Randy Crowley, Jr., Acting Pro Se, O'Fallon, MO, for respondent.

Before Division Three: ALOK AHUJA, P.J., and VICTOR C. HOWARD and GARY D. WITT, JJ.

ALOK AHUJA, Judge.

Following a bench trial, the Circuit Court of Clinton County entered a judgment which ordered the Successor Trustee of the Joseph O'Connor and Mary O'Con-

nor Trust to execute a deed transferring the Trust's interest in the O'Connors' former residence to Amber Crowley Koenen, one of the O'Connors' grandchildren. The O'Connors' other grandchildren appeal. We affirm.

## Factual Background

On April 18, 2002, Joseph O'Connor and Mary O'Connor, husband and wife, created the Joseph O'Connor and Mary O'Connor Trust (the "Joint Trust"), as grantors and trustees. The O'Connors were also named beneficiaries of the Joint Trust. The Joint Trust was revocable during the lifetime of both of the O'Connors; the Declaration of Trust provided, however, that "[u]pon the death of either of the Grantors, no power to alter, revoke or amend this Instrument shall be enjoyed by the surviving Grantor." The Declaration of Trust provided that upon the death of both of the O'Connors, the income and principal in the Joint Trust were to be paid, in equal shares, to their five grandchildren: Caitlynn Eleanor Crowley; Cassandra Lynn Crowley; Amber Christine Crowley (now known as Amber Crowley Koenen); Randy Gerald Crowley Jr.; and Shaina Rene Crowley.[1]

On May 21, 2002, the O'Connors transferred their residence into the Joint Trust.

Joseph O'Connor passed away in July of 2003. After Mr. O'Connor's death, Mrs. O'Connor consulted with attorney Ronald Mullennix on May 7, 2005. According to Mullenix's testimony at trial, Mrs. O'Connor "indicated she wanted to change the distribution of assets at the time of her death." Mullenix informed Mrs. O'Connor that according to his reading of the Declaration of Trust, she could not amend or revoke the terms of the Joint Trust. He told her, however, that she could withdraw property from the Joint Trust as the sur-

viving grantor, and the Joint Trust's sole trustee and beneficiary.

Following his meeting with Mrs. O'Connor, Mullennix prepared a new trust agreement, which established the Mary F. O'Connor Trust (the "New Trust"). Mrs. O'Connor executed the Trust Agreement for the New Trust on July 26, 2005.

Mrs. O'Connor wished to transfer her residence to the New Trust. To enable Mullenix to prepare the conveyance documents, Mrs. O'Connor provided Mullenix with the deed by which the O'Connors originally acquired the property. She failed, however, to provide Mullenix with a copy of the May 2002 deed by which the O'Connors had transferred the property into the Joint Trust.

Based on the deed provided to him, Mullennix prepared a warranty deed, which on its face purported to transfer the property from "Mary O'Connor, a single person" as grantor, to "Mary F. O'Connor, as Trustee of the Mary F. O'Connor Trust dated July 26, 2005" as grantee. Mrs. O'Connor executed this deed on July 26, 2005, the same day on which she executed the Trust Agreement for the New Trust. Mullenix testified that at the time of preparing the warranty deed, both he and Mrs. O'Connor believed the property was held by Mrs. O'Connor individually, and that "at that point, to my knowledge, [the Joint Trust] did not have assets in it." At the time Mrs. O'Connor executed the Trust Agreement for the New Trust and the warranty deed, Mullenix provided her with a letter explaining the documents he had prepared for her, and providing her with instructions for transferring other assets into the New Trust; that letter informed her that "[w]e have prepared a Warranty Deed transferring your residence to your

1. At the time of the creation of the Joint Trust, none of the O'Connors' children were living.

trust."[2] Although Mullenix did not believe the Joint Trust contained any assets, his instruction letter also advised Mrs. O'Connor that she had the power to withdraw any assets in the Joint Trust, and transfer them to herself and then to the New Trust.

In January 2007, Mrs. O'Connor contacted Mullenix and told him "that she wanted to be certain that her granddaughter Amber Koenen received her residence at her death." According to Mullenix's testimony, "Mrs. O'Connor was . . . adamant that . . . the house go directly to Amber . . . and not be a part of the [New] [T]rust." On January 9, 2007, Mrs. O'Connor executed a Trustee's Deed which Mullenix had prepared, which purported to transfer the property out of the New Trust to Mrs. O'Connor individually. On the same day, Mrs. O'Connor also executed a Beneficiary Deed naming Koenen as the sole beneficiary upon Mrs. O'Connor's death.

Mrs. O'Connor died on September 12, 2007.

Following Mrs. O'Connor's death, Amber Koenen and her family moved into the O'Connors' residence. Koenen testified that after she moved into the home, she and her husband paid all of the expenses associated with the property, and that the accounts for taxes, utilities, and insurance were in their names. In the summer of 2010, however, Mullenix learned from a title company that the property was still titled to the trustees of the Joint Trust. On February 7, 2011, the Successor Trustee of the Joint Trust, Kurt Thompson, filed a Petition for Declaratory Judgment against the named beneficiaries of the Joint Trust, seeking a declaration that the July 26, 2005 warranty deed effectively exercised Mrs. O'Connor's power, as trustee of the Joint Trust, to transfer the property from the Joint Trust to the New Trust. Mullennix testified at trial to the circumstances described above. He also testified that, at the time of the execution of the warranty deed, "I believed it effectively conveyed her house into the trust," and that he was "still . . . of the strong opinion that it accurately reflected her wishes and her intent at that point in time." Mullenix testified that, in his interactions with Mrs. O'Connor, "two things were clear: She believed she owned the house and could convey it effectively into the trust; [and] she ultimately wanted Amber to have that house as Amber's home."

On October 11, 2011, the trial court entered its Judgment, which concluded that Mrs. O'Connor "intended for her granddaughter, Amber Crowley Koenen, . . . to own" the residence, and that "the real estate records of Clinton County, Missouri should be corrected to comport with the intent of Mary O'Connor, deceased, as found by this Court." The trial court's judgment ordered the Successor Trustee to execute a Trustee's Deed, conveying the Joint Trust's interest in the residence to Koenen. The O'Connors' other grandchildren appeal.

## Analysis

### I.

In their first Point on appeal, the Appellants argue that the trial court's judgment, which ordered the conveyance of the residence from the Joint Trust to Koenen, amounted to a reformation of the deed Mrs. O'Connor executed in July 2005, and that the evidence was insufficient to

---

2. After recording the deed, Mullenix mailed a copy of the file-stamped deed to Mrs. O'Connor on October 6, 2005, with a cover letter stating, "[e]nclosed is the original, recorded Warranty Deed transferring property to your Trust."

support this result. We disagree.[3]

The standard of review for a declaratory judgment is the same as that established in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), for court-tried cases: "[T]he trial court's decision should be affirmed unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Guyer v. City of Kirkwood*, 38 S.W.3d 412, 413 (Mo. banc 2001).

*Laclede Cnty. v. Douglass*, 43 S.W.3d 826, 827 (Mo. banc 2001). "We view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the judgment and disregard all evidence and inferences to the contrary." *Inman v. Missouri Dept. of Corr.*, 139 S.W.3d 180, 183 (Mo.App. W.D.2004) (citation omitted).

▬▬▬ Based on the evidence presented, the trial court could properly have concluded that reformation of the July 26, 2005 warranty deed, to identify the grantor as Mrs. O'Connor *in her capacity as trustee of the Joint Trust*, was justified based on mutual mistake.

Reformation of a written instrument is an extraordinary equitable remedy and should be granted with great caution and only in clear cases of fraud or mistake. Reformation is a remedy by which a party to a contract may obtain modification of the terms of the contract such that those terms reflect the parties' original intent in forming the contract. Equity will reform an instrument which, through mutual mistake of the parties, does not accurately set forth the terms of the agreement actually made or which

does not incorporate the true prior intentions of the parties.

A mutual mistake occurs when both parties, at the time of contracting, share a misconception about a basic assumption or vital fact upon which they based their bargain. This is normally a question of fact. In a bench-tried case such as this, the trial judge is the finder of fact. To establish a mutual mistake in an instrument, it is not necessary to show that the parties theretofore had agreed upon any particular words or language to be used in the instrument, but it is sufficient to show that they agreed to accomplish a particular object by the instrument to be executed and that such instrument, as executed, is insufficient to effectuate their intention.

Trial courts can reform a written instrument only upon clear, cogent, and convincing evidence that leaves no room for reasonable doubt. This degree of proof relates not only to the existence of a mutual mistake, but also to establishment of the actual agreement allegedly made.

The party seeking reformation must show that: (1) a preexisting agreement between the parties affected by the proposed reformation is consistent with the change sought; (2) a mistake was made in that the deed was prepared other than as agreed; and (3) the mistake was mutual, *i.e.*, it was common to both parties.

*Will Invs., Inc. v. Young*, 317 S.W.3d 157, 164–65 (Mo.App. S.D.2010) (citations and internal quotation marks omitted); *see also, e.g., Ethridge v. TierOne Bank*, 226 S.W.3d 127, 132 (Mo. banc 2007); *Lunce-*

---

**3.** The trial court's judgment does not actually order the reformation of the July 26, 2005 warranty deed, but instead orders the Successor Trustee of the Joint Trust to execute a document conveying the property to Koenen.

Appellants do not take issue with the manner in which the trial court implemented its judgment, and we accordingly do not address the issue.

*ford v. Houghtlin,* 326 S.W.3d 53, 63 (Mo. App. W.D.2010); *Cardinal Partners, LLC v. Desco Inv. Co., L.L.C.,* 301 S.W.3d 104, 109–10 (Mo.App. E.D.2010).

■ At the time of the warranty deed's execution, Mrs. O'Connor was the sole trustee, grantor, and beneficiary of both the Joint Trust and the New Trust. It is well settled under Missouri law that "[a] trust is not a legal entity. The trustee is the legal owner of the trust property, in which the beneficiaries have equitable ownership." *Farris v. Boyke,* 936 S.W.2d 197, 200 (Mo.App. S.D.1996) (citations omitted). Therefore, Mrs. O'Connor was the proper person to execute the deed conveying the residence, and to represent the grantee of the property, whether she was acting in her individual capacity, or in her capacity as trustee or beneficiary of the Joint Trust or of the New Trust. Appellants do not argue otherwise.

Clear, cogent and convincing evidence was presented at trial that Mrs. O'Connor was mistaken as to the capacity in which she owned the residence at the time she executed the July 26, 2005 warranty deed. The warranty deed itself states the misconception under which Mrs. O'Connor was operating. It recites:

> WHEREAS, party of the first part [identified as the grantor, Mrs. O'Connor, "a single person,"] believes that Grantor's estate in and title to the Subject Property is currently vested as follows: JOSEPH O'CONNOR and MARY O'CONNOR. Party of the first part states that JOSEPH O'CONNOR died on July 21, 2003, and that at the time of his death MARY O'CONNOR and JOSEPH O'CONNOR were married never having been divorced.

The testimony of Mrs. O'Connor's attorney, Ronald Mullenix, confirms that she was mistaken as to the property's ownership. He testified that Mrs. O'Connor provided him with the deed by which she and Mr. O'Connor initially purchased the property for his use in preparing the July 26, 2005 warranty deed, reflecting her mistaken belief that the property remained titled as it had been at the time of the O'Connors' initial acquisition. She failed to provide Mullenix with the May 21, 2002 warranty deed by which the O'Connors transferred their home into the Joint Trust, and failed to inform him that the property was titled in that fashion. Mullenix testified unequivocally that, based on his consultations with Mrs. O'Connor, and on the documents she provided him, he believed that Mrs. O'Connor owned the property in her individual capacity, and that no assets were held by the Joint Trust; more importantly, he also testified that this was Mrs. O'Connor's understanding at the time.

Clear, cogent and convincing evidence also established that Mrs. O'Connor intended to transfer the residence to the New Trust, regardless of the manner in which the residence was then titled, and that she believed she had accomplished this objective when she executed the July 26, 2005 warranty deed. Mullenix testified that, when he first met with Mrs. O'Connor, she expressed her desire to dispose of her property, including any property held by the Joint Trust, according to a different dispositive scheme than that contained in the Joint Trust. Although Mullenix told Mrs. O'Connor that she did not have the power to amend or revoke the Joint Trust following her husband's death, he advised her that she had the authority to withdraw property from the Joint Trust.[4] Mullenix

---

4. Mullenix's testimony concerning Mrs. O'Connor's initial consultation with hi m, and

the advice he gave her, is arguably in tension with his testimony that both he and Mrs.

repeated this advice in the letter of instructions he provided to Mrs. O'Connor when the New Trust was created, and instructed her to transfer any property then held by the Joint Trust to the New Trust in order to implement her stated intentions. Thus, the evidence indicates that Mrs. O'Connor was prepared to transfer any property held by the Joint Trust to the New Trust, to the extent it was necessary to do so. Moreover, Mullenix's letter of instructions, and his cover letter enclosing a file-stamped copy of the July 26, 2005 warranty deed, both stated to Mrs. O'Connor that the warranty deed had accomplished her over-arching objective: to transfer her residence into the New Trust, so that she had unrestricted control over it, and could transfer it to Koenen upon her death.

Mrs. O'Connor's actions subsequent to the execution of the July 26, 2005 warranty deed provide further evidence that she understood that the 2005 deed had effectively transferred her home into the New Trust. In 2007, she transferred the property *out of* the New Trust, and then executed a further beneficiary deed which left the property to Koenen on Mrs. O'Connor's passing. None of this would have been necessary, or effective, if Mrs. O'Connor believed that the property remained titled in the name of the Joint Trust.

Appellants do not dispute this evidence. Instead, they argue that this evidence is insufficient to support reformation, because Mrs. O'Connor herself did not testify to her intentions. Appellants argue that, "[b]ecause Mary was deceased at the time of trial, there was no clear, cogent and convincing testimony offered by the parties to the deed in question, nor was there any evidence of mutual mistake."

Appellants' argument appears to be that reformation cannot be ordered without evidence, from the mouths of the parties to the instrument, as to their intentions when they executed it; if we accepted their argument, reformation could not be ordered in any case in which one or more of the parties to an instrument are deceased. Appellants cite no authority to support their argument that Mrs. O'Connor's testimony was essential to proving grounds for reformation based on mutual mistake. And our independent research has revealed none. To the contrary, Missouri courts have long recognized that an instrument can be reformed not only at the request of the parties to the instrument, but at the instance of certain third parties:

It has been said it is the province of a court to enforce contracts and conveyances, not to make or alter them; but it is the duty of the court to enforce the contract that was really made, and when by mutual mistake a contract or other instrument is not expressed in such terms as have the force and effect that the parties intended, then it is the clear duty of the court to correct the mistake. This power of a court of equity to reform an instrument, which by reason of mistake fails to express the intention of the parties, has long been considered unquestionable. And courts of equity have exerted the power to reform an instrument so as to make it speak the real agreement made between the parties in those cases where, because of the mistake or inadvertence of the scrivener,

O'Connor believed that she owned the residence in her personal capacity: there seemingly would have been no reason for Mrs. O'Connor to ask whether she could amend the Joint Trust's terms, or for Mullenix to advise her that she retained the right to withdraw assets from the Joint Trust, if the residence had not been placed into the Joint Trust. Any internal inconsistency in Mullenix's testimony was for the trial court to weigh in its role as factfinder.

the writing fails to do so; and *a court of equity will exercise this power not only as between the original parties, but as to those claiming under them in privity, such as personal representatives, heirs, assigns, grantees, judgment creditors or purchasers from them with notice of the facts.*

*Walters v. Tucker,* 308 S.W.2d 673, 675 (Mo.1958) (emphasis added; citation omitted); *see also, e.g., Zahner v. Klump,* 292 S.W.2d 585, 588 (Mo.1956); *Snider v. Miller,* 352 S.W.2d 161, 164 (Mo.App.1961). Obviously, if an instrument can be reformed with respect to "heirs" and "personal representatives" of a party to an instrument, this presupposes that reformation can be ordered where the party is not available to testify to their intentions.

Caselaw also holds that, in an action for reformation based on mutual mistake, third parties may provide evidence to establish the intent of a deceased party to an instrument. *Morris v. Brown,* 941 S.W.2d 835, 842 (Mo.App. W.D.1997) (noting that "[n]one of respondents' witnesses alluded to any conversation with Massey[, a deceased grantee under a warranty deed,] or what her intent was as to the titling of the property. In the absence of any evidence establishing a preexisting agreement with Massey as to the titling of the property as a joint tenancy, respondents' claim for reformation must fail."); *Wates v. Joerger,* 907 S.W.2d 294, 296 (Mo.App. S.D.1995) (holding that children of deceased grantee under warranty deed were competent to testify to deceased grantee's intent at time of transaction); *see generally Lunceford v. Houghtlin,* 326 S.W.3d 53, 72 (Mo.App. W.D.2010) (rejecting the appellants' argument "that the

*only* persons who can testify about the intent of the parties in entering into a mistaken document are the persons who engaged in the negotiations").[5] The fact that Mrs. O'Connor was not available to testify to her intentions in executing the July 26, 2005 warranty deed did not prevent the trial court from ordering reformation.

Point I is denied.

## II.

■ In their second Point, Appellants argue that Mrs. O'Connor lacked the power to convey the residence out of the Joint Trust in July 2005, because the Joint Trust became irrevocable on Mr. O'Connor's death in July 2003. Once again, we disagree.

■ We review a trial court's interpretation of the language of a trust *de novo. Kimberlin v. Dull,* 218 S.W.3d 613, 615 (Mo.App. W.D.2007) (citation omitted).

[T]he paramount rule of construction in determining the meaning of a trust provision is that the grantor's intent is controlling. In determining the intent of a grantor, courts are to consider the trust instrument as a whole and are not to give any clause in the trust undue preference. Absent ambiguity, the intent of the settlor is determined from the four corners of the trust instrument. It is not this court's function to rewrite a trust in order to effectuate a more equitable distribution or to impart an intent to the testatrix that is not expressed in the trust.

*Kimberlin,* 218 S.W.3d at 616 (citations and internal quotation marks omitted).

---

5. We note that, on appeal, Appellants make only a sufficiency-of-the-evidence argument. They do not argue that Mullenix's testimony, or the other evidence offered to establish Mrs.

O'Connor's intent, was incompetent as an evidentiary matter. Our opinion should not be read to address any such evidentiary issues.

Multiple provisions of the April 18, 2002 Declaration of Trust lead us to conclude that, following Mr. O'Connor's death, Mrs. O'Connor possessed the authority to withdraw property from the Joint Trust. First, § 1.U of the Declaration of Trust provides that the Trustees of the Joint Trust [6] are empowered "[t]o make gifts of trust income or principal to any person or class of persons who are named as beneficiaries or contingent beneficiaries of this Trust, or to spray such income among said beneficiaries rather than incur it in the Trust." Mrs. O'Connor was the sole present beneficiary of the Joint Trust at the time of the execution of the July 26, 2005 warranty deed, and therefore, under § 1.U, she was authorized (in her capacity as Trustee) to make a gift of trust principal to herself (in her capacity as beneficiary of the Joint Trust). Moreover, even if we were to consider that the purpose of the July 26, 2005 transaction was to prefer one contingent beneficiary (Koenen) over the other contingent beneficiaries, § 1.U authorizes this differential treatment when it refers to a gift to "any person *or* class of persons who are named as ... contingent beneficiaries." (Emphasis added.) Section 1.U supports the action Mrs. O'Connor took (albeit imperfectly) on July 26, 2005.

Section 3.B of the Declaration of Trust provides further authority for Mrs. O'Connor's transfer of the residence out of the Joint Trust. That sub-section provides:

The Grantors shall, at any time during the lifetimes of both Grantors, have the power to alter, amend or revoke this Instrument by an Instrument in writing, executed by Grantors and acknowledged in the same form in which deeds are acknowledged. The said Grantors may, at any time, withdraw from the Trust, cash or other assets constituting a part of the corpus of this Trust, and upon the request of the said Grantors, the Trustees shall distribute to the Grantors, such assets as the Grantors may so request, and the title thereto shall thereupon become vested in the Grantors, as Grantors' absolute property, free of this Trust, and such withdrawal of cash or other assets shall not be construed as an alteration, amendment or partial revocation of this Trust. Upon the death of either of the Grantors, no power to alter, revoke or amend this Instrument shall be enjoyed by the surviving Grantor.

Section 3.B denies a surviving grantor the power "to alter, revoke or amend" the Declaration of Trust following the death of the other grantor. It also provides, however, that the grantors may withdraw assets from the Joint Trust "at any time," and specifies that such a withdrawal "shall not be construed as an alteration, amendment or partial revocation of this Trust." The withdrawal power is unlimited in time: unlike the power to alter, revoke or amend the Declaration of Trust, which is only available "at any time *during the lifetimes of both Grantors*," the power to withdraw assets is granted "at any time," without the qualification that both grantors must be living. The omission of the phrase

---

**6.** Upon Mr. O'Connor's death, Mrs. O'Connor became the sole Trustee of the Joint Trust, and had the authority to act on behalf of the Trust. *See* § 456.7–703.2, RSMo Cum.Supp. 2012 ("If a vacancy occurs in a cotrusteeship, the remaining cotrustees may act for the trust."). The same rule applied under the version of Missouri's trust code in effect at the time that the Joint Trust was established. *See*

§ 456.540.2, RSMo 2000 ("If two or more trustees are appointed to perform a trust, and if any of them is unable or refuses to accept the appointment, or having accepted, ceases to be a trustee, the surviving or remaining trustees shall perform the trust and succeed to all the powers, duties, and discretionary authority given to the trustees jointly.").

"during the lifetimes of both Grantors" from the sentence authorizing withdrawals of property, when that phrase is used in the immediately preceding sentence, is "powerful evidence" that the power to withdraw assets was *not* similarly limited to the time period when both of the O'Connors were living. *Denbow v. State,* 309 S.W.3d 831, 835 (Mo.App. W.D.2010).

We recognize that § 3.B refers to actions taken by the "Grantors" and the "Trustees," in the plural. The Declaration of Trust provides, however, that the use of the plural in the instrument shall be deemed to include the singular, where appropriate.[7] Such a construction is appropriate here—given that the power to withdraw assets was not limited to the time period during which both of the O'Connors were living, the Declaration of Trust contemplates circumstances in which only one of the O'Connors would be acting to withdraw assets. The second sentence of § 3.B therefore expressly authorized Mrs. O'Connor, following her husband's death, "to withdraw ... cash or other assets" from the Joint Trust, and receive title to those assets as her "absolute property, free of this Trust."

The Appellants argue that, by interpreting the Declaration of Trust to permit Mrs. O'Connor to withdraw the Joint Trust's principal asset following Mr. O'Connor's death, the trial court failed to consider Mr. O'Connor's intent, stated in the Declaration of Trust, that all five of the O'Connors' grandchildren inherit the O'Connors' property equally following the death of both Mr. and Mrs. O'Connor. In the absence of ambiguity, however, we must determine the O'Connors' intent from the terms of the Declaration of Trust.

While the Declaration of Trust includes the provision Appellants cite, it *also* includes §§ 1.U and 3.B, which authorize Mrs. O'Connor's actions. We recognize that, at the time of the execution of the Declaration of Trust, the O'Connors evidently expected that all five of their grandchildren would inherit their estate in equal proportions; but they also gave significant authority to the surviving spouse to deal with the trust property as the survivor saw fit. While it may be that Mr. O'Connor contemplated that his five grandchildren would each receive equal inheritances, he also evidently believed it important to give his wife broad power to deal with their property in the manner she deemed appropriate if she survived him. In addition, the first and third sentences of § 3.B demonstrate that the O'Connors knew how to limit the surviving spouse's authority following the death of the other spouse. Yet they chose not to impose such limitations on the survivor's powers to make gifts of trust property, or to withdraw property from the Trust. That omission must be given weight. The trial court's decision, which we affirm today, is fully consistent with Mr. O'Connor's intent as stated in the Declaration of Trust's unambiguous provisions.

Point II is denied.

### Conclusion

The circuit court's judgment is affirmed.

All concur.

---

7. Section 8 of the Declaration of Trust provides: "The masculine gender shall be deemed, where appropriate, to include the feminine or neuter, and the singular or [*sic*] the plural, vice versa." While not a model of draftsmanship, the meaning of this commonplace provision is apparent. *Compare* § 1.030, RSMo.