**Marsha Sue McNABB, Appellant,**

v.

**Robert BARRETT, et al., Respondent.**

**No. WD 68605.**

Missouri Court of Appeals,
Western District.

June 24, 2008.

Bradley A. Constance, Independence, MO, for Appellant.

John K. Allinder, Independence, MO, for Respondent.

Before JOSEPH M. ELLIS, Presiding Judge, LISA WHITE HARDWICK, Judge and JOSEPH P. DANDURAND, Judge.

JOSEPH M. ELLIS, Judge.

Marsha Sue McNabb appeals from a judgment in favor of Respondents Robert L. Barrett, Evelyn E. Barrett, Wesley R. Barrett, Shelley K. Barrett and Jackie Barrett on her petition to quiet title. Appellant asserts that the trial court erred in finding that, although the sale of an adjoining lot was completed without providing her with written notice as required under a restrictive covenant, she waived her right of first refusal by her conduct. For the following reasons, we affirm.

Appellant and Respondents live in Lake Tapawingo, a residential development in Jackson County, Missouri. Appellant purchased Lot 50, Block C, in 1988 and began living there after building a house about a year later. Evelyn Halsey owned Lots 47, 48, and 49, Block C, and lived in a home on Lot 48 (together, "the Property"), from 1994 through her death in August 1999. Respondents Robert and Evelyn Barrett, husband and wife, owned and lived on Lot 19, Block C, about a block away from Appellant's lot, starting in 1974. Respondents Wesley and Shelley Barrett are the Barretts' son and daughter, and Jackie Barrett was Wesley's wife at the time the sale at issue took place.

In the late 1990s, Mrs. Halsey became unable to care for herself or manage her affairs, and one of her neighbors, G. Michael Putthoff, looked after her and the Property pursuant to a power of attorney. Mrs. Halsey was hospitalized then placed in a nursing home in October 1998, and Mr. Putthoff asked Wesley and Jackie to move into her home to care for her dog. Wesley and Jackie agreed and lived in the home until Mrs. Halsey died on August 15, 1999, and after her death. Appellant was aware of this arrangement and was aware that Mrs. Halsey had passed away.

Mrs. Halsey left a will that designated Mr. Putthoff as personal representative and left the Property to a niece out of state. Mr. Putthoff was subsequently appointed as personal representative, and Mrs. Halsey's niece asked him to sell the Property. He obtained an appraisal on October 18, 1999, and the realtor valued the three lots at $45,000. The house was in severe disrepair, including substantial termite damage, a leaky roof, and bad electrical wiring, so Mr. Putthoff subtracted $5,000 from the price for the approximate cost to demolish and remove the home.

Mr. Putthoff then approached Evelyn Barrett and asked if Wesley and Jackie would be interested in purchasing the Property. After a few months, Respon-

dents agreed to purchase the Property for $40,000. They signed a sales contract on January 10, 2000, and closed on January 21, 2000. Immediately after closing the sale, Wesley and Jackie began making numerous structural and aesthetic repairs and improvements on the house. They continued to make improvements for several years, and the value of the Property increased substantially over those years.

All of the lots in Lake Tapawingo are subject to a restrictive covenant ("the Covenant"), which provides that the sale of any lot is subject to an adjoining lot owner's right of first refusal. In pertinent part, the Covenant states that "[n]o sale of said lot shall be consummated without giving at least fifteen days written notice to Grantor, and the owners of the two lots adjoining said lot on the sides, of the terms thereof; and any of them shall have the right to buy said lot on such terms." Although she was the sole owner of an adjoining lot, Appellant did not receive written notice of the sale of the Property or sign a written waiver of her right of first refusal.

On April 28, 2004, Appellant filed a petition to quiet title, asserting that she had an interest in the Property because she never received written notice and that, had she received written notice, she would have purchased the Property for $40,000 on the same terms as the sale to Respondents. Appellant prayed for the court to declare the deed transferring the Property to Respondents null and void, to declare that Appellant would own the Property in fee simple upon payment of $40,000 to Respondents, to give her possession of the Property, and to enjoin Respondents from committing waste or removing any of the improvements on the Property.

In their answer, Respondents denied that Appellant had any interest in the Property. They asserted the affirmative defenses of estoppel, laches, lack of consideration, waiver, actual and constructive notice, unclean hands, and violation of the statute of frauds. Respondents also filed a counterclaim to recover the cost of improvements, maintenance, property taxes, and the increase in value on the Property due to their improvements in the event that the court granted any relief to Appellant.

The case was tried to the court on April 9–10, 2007, and the court subsequently entered its judgment and findings of fact and conclusions of law denying any relief to Appellant, decreeing that the title to the Property remain in Respondents' names, and denying Respondents' counterclaim as moot. The court concluded that the sale of the Property was in violation of the Covenant but that Appellant was not entitled to any relief because she waived her right of first refusal by her conduct. This appeal follows.

■ In an action to quiet title we review the trial court's judgment under the standard of review established in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *O'Dell v. Mefford*, 211 S.W.3d 136, 138 (Mo.App. W.D.2007). "Accordingly, the judgment of the trial court will be affirmed unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law." *Id.* "We view the evidence, and permissible inferences therefrom, in the light most favorable to the trial court's judgment, and we disregard all contrary evidence and inferences." *Brown v. Mickelson*, 220 S.W.3d 442, 447 (Mo.App. W.D. 2007) (internal quotation omitted). "We defer to the trial court's factual findings, giving due regard to the trial court's opportunity to judge the credibility of the witnesses." *Id.* (internal quotation omitted). "Our primary concern is the correctness of the trial court's judgment, not the

route it took to get that result, and therefore, we will affirm the judgment if it is supported by any reasonable theory, even if different from that expressed by the trial court." *O'Dell,* 211 S.W.3d at 138 (internal quotations omitted).

Appellant asserts three points of error, but they are essentially alternate arguments concerning her contention that the trial court erroneously concluded that she was not entitled to any relief because she waived her right of first refusal by her conduct. In her first point, Appellant contends that the trial court erroneously applied the law by considering her conduct prior to the date the sales contract was signed because her preemptive right had not yet become a full option. Appellant asserts in Point II that, even if the court properly considered evidence of her conduct prior to the date the sales contract was signed, its ruling was against the weight of the evidence because there was insufficient evidence to establish a waiver. She argues in her third point that the evidence of her conduct after the sales contract was signed was insufficient to establish a waiver or laches. We will address all three points together.

A right of preemption is " 'a conditional option under which the preemptioner has the right to purchase subject to some condition, the condition being generally (despite variation in phraseology) that the owner must first arrive at a decision to sell.' " *Blue Ridge Bank & Trust Co. v. Trosen,* 221 S.W.3d 451, 460–61 (Mo.App. W.D.2007) (quoting *Gilmore v. Letcher,* 508 S.W.2d 257, 262 (Mo.App. 1974)). The preemptive right is " 'merely contingent' " until the owner " 'arrive[s] at a decision to sell the property,' " at which point the preemptive right " 'ripens into a full option.' " *Id.* at 461 (quoting *Gilmore,* 508 S.W.2d at 262).

"Parties can waive rights of first refusal." *Id.* at 462. "Waiver is the *intentional* relinquishment of a known right. While a party's conduct can result in waiver of a contractual right, the conduct must be so manifestly consistent with and indicative of an intention to renounce a particular right or benefit that no other reasonable explanation of the conduct is possible." *Horne v. Ebert,* 108 S.W.3d 142, 147 (Mo.App. W.D.2003) (internal citation, quotations, and brackets omitted). "A party asserting waiver of restrictive covenants in a subdivision indentures has the burden of proving waiver." *Wallace v. Grasso,* 119 S.W.3d 567, 576 n. 6 (Mo. App. E.D.2003).

Where an owner sells property in breach of a contractual right of first refusal, the individual with the right has "a cause of action for damages against the [seller] or in the alternative a right of specific performance against the [purchaser]" who had notice of the right of first refusal. *C & J Delivery, Inc. v. Vinyard & Lee & Partners, Inc.,* 647 S.W.2d 564, 569 (Mo.App. E.D.1983). However, where the individual with a preemptive right "fail[s] to invoke [her] right of specific performance within a reasonable time after the breach, [she] must be deemed to have waived that right." *Id.* Nonetheless, the individual "retains [her] cause of action against the [seller] for breach of the covenant of first refusal, provided only that [she] brings [her] suit within the period of time fixed by the statute of limitations." *Id.*

In the case at bar, the trial court found that Appellant's right of first refusal arose "once G. Michael Putthoff decided to sell the property at issue and in fact executed a binding contract." The court further stated, "If the notice had been given, and [Appellant] had accepted the pre-emptive right to purchase the property . . ., a com-

pleted contract for sale between Putthoff and [Appellant] would have existed." Accordingly, the court concluded that the Covenant was not complied with and that Appellant was entitled to recover unless Respondents established an affirmative defense. The court then concluded that Appellant had waived her right of first refusal by her conduct, reasoning as follows:

The evidence regarding the conduct of Plaintiff in this case is so manifestly consistent with and indicative of an intention to renounce her pre-emptive right of purchase under the restrictive covenant that there is no other reasonable explanation for her conduct. It is clear from the evidence that Plaintiff did not have a present intent to exercise her pre-emptive right to purchase the property at the time of the sale to Defendants in 2000. Both Plaintiff and her husband knew of the pending sale and its terms, and expressly indicated that they were not interested in purchasing the property. It is clear that the desire at this late date to exercise her pre-emptive right of purchase is motivated by the increase in property value and the opportunity to acquire property that is worth substantially more today than it was in the year 2000.

Having found that waiver was established, the court did not address the remaining affirmative defenses. The court stated that its findings of fact, conclusions of law, and judgment were in accordance with its "findings regarding the credibility of witnesses."

In addition to the facts stated above, the court made the following findings of fact concerning the relationship between the parties and Appellant's knowledge of the sale, which are supported by the record:

Appellant and Respondents were "well acquainted." Appellant purchased her lot from JoAnne Lasher; they had worked together for several years and remained very close after Mrs. Lasher retired. Appellant, Mrs. Lasher, and Robert and Evelyn Barrett "had the same circle of friends and socialized together frequently." Prior to and at the time of the sale of the Property, Appellant was married to Wesley McNabb. Robert Barrett and Mr. McNabb were good friends until the latter passed away on July 26, 2000. Wesley Barrett was also best friends with Appellant's son, and "the children spent considerable time at each other's homes while they were growing up" and continued to be friends into adulthood.

During the months of October, November, and December 1999, the Barretts discussed their possible purchase of the Property with friends and neighbors, including Appellant. More specifically, in October 1999, after discussing a possible sale with Mr. Putthoff, Evelyn Barrett called Appellant and told her that they intended to purchase the Property and asked if Appellant was interested in or would exercise her option to purchase the Property. Appellant responded that she was interested in the Property but could not afford it, and she wished Evelyn well in purchasing the Property.

On November 27, 1999, Appellant's husband was assisting Wesley Barrett with plumbing repairs on the Property. Robert, Evelyn, Wesley, and Jackie Barrett and Appellant and her husband were present during a discussion about purchasing the Property. Evelyn initiated the conversation because she had not previously discussed the purchase with Mr. McNabb and she wanted to know his position on the matter. She told Appellant and her husband that the purchase price was $40,000. Mr. McNabb stated that he and Appellant would not be purchasing the Property because they didn't "have a pot to piss in," and Appellant agreed.

Robert and Evelyn Barrett had lived at Lake Tapawingo for over thirty years and were "well aware" that the Covenant required written notice to adjacent landowners prior to the sale. They asked these questions of Appellant and her husband because they "did not want to waste their time and efforts in trying to acquire the property if the McNabbs were interested and going to buy the property." They assumed that Mr. Putthoff and his attorneys would obtain a written waiver from Appellant prior to the sale.

After closing on the Property on January 21, 2000, Wesley and Jackie had assistance from family, friends, and neighbors in making substantial repairs and improvements on the Property. Appellant's husband helped with plumbing and her son helped with roofing, and they were both paid for their services.

Appellant and her husband continued to socialize with Robert and Evelyn after the sale. They discussed Appellant possibly purchasing half a lot from Wesley and Jackie to make a garden, and Appellant requested at one point that Wesley remove a tree from Lot 49. In November 2003, while Appellant and Evelyn were visiting with Mrs. Lasher, they had a discussion concerning the waiver issue with another neighbor. Appellant told Mrs. Lasher that she never received a written waiver back in 2000 and that she might try to take action as a result, and Mrs. Lasher told Appellant, "Marsha, it's been three and a half years; it's a little late."

Appellant denied that any of the above conversations occurred. She also denied any knowledge that her husband and son had helped with improvements on the home, and she claimed that she did not even see most of the improvements while they were occurring next door to her own house. She insisted that she was "suspicious" that Respondents had purchased the Property but that she did not know for sure until 2004. The trial court's findings of fact indicate that it did not believe Appellant's testimony on these matters. The court also expressly found that Appellant's testimony that she had no knowledge of the sale was not credible and that she knew about the sale when it occurred in January of 2000. We defer to the trial court's credibility determinations. *Brown*, 220 S.W.3d at 447.

On appeal, Appellant first argues that the trial court improperly considered her conduct prior to the time when her right of first refusal ripened into a full option, or when the sales contract was signed in January 2000, to determine whether she had waived her right. Appellant further contends that, although evidence was presented that she was told the sale price in November 1999, there was no evidence that she was ever told the terms of the sale as required under the Covenant. She relies on *Blue Ridge Bank & Trust Co. v. Trosen*, 221 S.W.3d 451 (Mo. App. W.D.2007).

*Trosen* involved a petition to quiet title after a sale in a residential development with a virtually identical restrictive covenant as in the case at bar. 221 S.W.3d at 454. Upon his death, a landowner directed that his lot be sold and the proceeds added to the corpus of a trust for the benefit of all the trust's beneficiaries. *Id.* at 454–55. Blue Ridge Bank & Trust ("the Bank") became the successor trustee, and it obtained an appraisal of the lot at $135,000 on October 22, 2004. *Id.* at 455. On February 4, 2005, the owners of an adjoining lot, the Hansons, made an offer to the Bank to purchase the lot for $135,000. *Id.* A few days later, the trust beneficiaries made an offer to the Bank to purchase the lot for $135,500. *Id.* The Bank telephoned the Hansons and asked if they wanted to bid against the trust beneficiaries, and the

Hansons declined to enter into a bidding war and "stated that they would not offer any additional money." *Id.* The Bank then accepted the trust beneficiaries' offer on February 7, 2005, and they executed a sales contract on February 9, 2005; the closing date was to be "on or before March 1, 2005." *Id.*

On February 15, 2005, the Bank sent a "Notice of Sale Property Waiver" to the Hansons indicating that the trust beneficiaries intended to purchase the lot. *Id.* The notice did not set forth the sale price or the terms of the sale, indicating only that it was a "transfer to a family member." *Id.* On February 23, 2005, the Hansons sent a letter to the Bank requesting that the closing date be postponed to reflect the required minimum fifteen-day notice. *Id.* at 456. The letter further stated that the Hansons had learned that the purchase price was $135,500 and that they were exercising their option to purchase the lot pursuant to the restrictive covenant, and it requested that the Bank confirm the sales price and the terms of the sale. *Id.* On March 1, 2005, the Hansons' attorney sent a letter to the Bank and the trust beneficiaries demanding that the sale not take place because it was in violation of the restrictive covenant and the Hansons' right of first refusal. *Id.* The closing date on the sales contract was extended to March 7, 2005, but the sale was not completed, and the Bank continued to hold the lot in the name of the trust. *Id.*

On March 4, 2005, the Bank filed an action against the trust beneficiaries and the Hansons seeking a declaration of the claimants' rights to the lot. *Id.* In response, the Hansons sought a declaration of their right to purchase the lot and specific performance, and the trust beneficiaries asserted that the Hansons had waived their right of first refusal. *Id.* The trial court concluded that the Hansons had

failed to exercise their preemptive right within fifteen days after they "received actual notice of the proposed sale" and that they also had "previously waived their preemptive right" by their telephone conversation with the Bank. *Id.* at 457–58.

On appeal, this Court first concluded that the trial court erred in finding that the Hansons were required to exercise their right of first refusal within fifteen days of receiving actual notice, as opposed to written notice, of the proposed sale because "[w]ritten notice was required" under the plain language of the restrictive covenant. *Id.* at 459–60. We further noted that the conversation with the Bank on February 7, 2005, would still have been insufficient notice because it relayed nothing about the terms of the sale and the Bank admittedly had not yet "determined to sell the property for $135,500." *Id.* at 461. Accordingly, we found that the Hansons "could not yet exercise their preemptive right" at that time, so the fifteen-day time limit for them to do so had not yet begun. *Id.*

This Court then found that the trial court erred in finding that the Hansons had waived their preemptive right. *Id.* at 462–63. We reasoned:

> *The Hansons never stated that they were not interested in purchasing [the lot.] Instead, Mr. Hanson expressed his desire to the Bank to exercise the right of purchase,* asserted he would not enter into a bidding war, and stated he would not offer to purchase [the lot] for a price above that offered by the Trust Beneficiaries. This was a logical course of action. The Hansons understood they had a preemptive right allowing them to purchase [the lot] for the price for which the Bank was willing to sell it. They did not need to better the Trust Beneficiaries' offer. Instead, if the Bank chose to sell [the lot] for the

Trust Beneficiaries' offer, the Hansons merely had to match that price. Further, they knew they would receive a written notice informing them of the price and terms for which the Bank eventually determined to sell [the lot.] Thus, they waited for the Notice of Sale form and, upon receiving it, timely exercised their preemptive right. There was no waiver.

*Id.* (emphasis added).

Appellant's contention that *Trosen* stands for the proposition, among other things, that the court may not consider conduct prior to the time the preemptive right ripens into a full option is, quite simply, incorrect. This Court clearly considered the Hansons' actions prior to the date the sales contract was executed to determine whether they had waived their right of first refusal. We simply found that their actions at that time were not sufficient to establish a waiver because the Hansons clearly expressed a desire to purchase the lot and acted in a logical manner to keep the sales price down in anticipation of exercising their preemptive right.

Likewise, *Trosen* does not support Appellant's assertion that there was insufficient evidence before the trial court to show that she waived her right of first refusal. She argues that her "statements expressing a lack of interest in the property or a lack of funds to purchase the property" simply showed her intent not to become involved in a bidding war and were reasonable to keep the price down. Neither of these arguments was presented to the trial court and, in fact, Appellant repeatedly denied that she had ever stated that she was not interested in purchasing the Property and claimed that she was unaware of the sale. The trial court chose to believe the testimony of several witnesses that Appellant and her husband stated on several occasions that they were not interested in purchasing the Property because they did not have the financial means to do so, and we defer to the court's credibility determinations. *Brown,* 220 S.W.3d at 447. This is a much different situation than in *Trosen,* and Appellant's attempt to align the facts is clearly an afterthought strictly for the purposes of appeal.

As noted in *Trosen,* "[a] party may waive any condition of a contract in the party's favor, and that waiver may be implied from conduct." 221 S.W.3d at 462 (internal quotation omitted). In this case, Appellant, with full knowledge of the details of the transaction, after making numerous declarations that she was not interested in or capable of purchasing the Property, waited more than four years before taking any action to exercise her right of first refusal by filing the instant action. This is in stark contrast to the conduct of the Hansons in *Trosen,* who never made a statement that they were not interested in purchasing the lot in question and immediately acted to exercise their option even though they did not receive a sufficient written notice. Indeed, in *Trosen,* there was a span of only twenty-three days between the bank signing a contract and suit being filed. Thus, there was clearly no waiver in *Trosen.* On the other hand, Appellant's conduct in this case is so " 'manifestly consistent with and indicative of an intention to renounce a particular right or benefit that no other reasonable explanation of the conduct is possible.' " *Id.* As found by the trial court, and supported by the record, "[i]t is clear that the desire at this late date to exercise [Appellant's] pre-emptive right of purchase is motivated by the increase in property value and the opportunity to acquire property that is worth substantially more today than it was in the year 2000." It has

nothing to do with a failure to receive notice in January 2000.

Accordingly, the trial court did not err in finding that Appellant was not entitled to any relief because she waived her right of first refusal by her conduct. The judgment is affirmed in all respects.

All concur.