EDWARD R. ARDINI, JR., JUDGE
Richard and Hallie Pals appeal from the grant of summary judgment entered by the Circuit Court of Jackson County, Missouri, in favor of the Costello Family Trust and trustees of the Dean Family Lotawana Trust and the Lester M. Dean, Sr. Self-Declaration of Trust regarding the rights to a dock attached to certain real property. We reverse and remand.
Factual and Procedural Background[1]
This case concerns the sale of two parcels of property located in Lake Lotawana, *565 Missouri. The first piece of property, designated S21, is situated on the lakeside of Lake Shore Drive and has been developed as a private residence. The S21 property has four docks registered with the Lake Lotawana Home Association ("the Association") and title was held by the Dean Family Lotawana Trust ("DFL Trust"). The second property, designated SA3B, is located across the street from the S21 property and had not been developed at the time of sale. Title to the SA3B property was held by the Lester M. Dean, Sr. Self-Declaration of Trust ("LD Trust"). Both the DFL Trust and the LD Trust share two individuals as trustees: Lorelei M. Dean and Melanie A. Dean (collectively the "joint trustees").
On October 2, 2014, the joint trustees entered into a contract ("the October 2nd contract") with the Costello Family Trust ("CF Trust") who agreed to purchase the S21 property for $875,000.00 with a closing date "on or before 10/31/2014." The October 2nd contract included several additional provisions, two of which are of considerable importance to this case. First, the contract stated that "[u]pon any improvement to [SA3B], the far west dock on S21 (covered dock) would go to [SA3B]." Second, the contract noted that "[t]his offer is for the 1st tier commonly known as S21, Buyer and Seller agree to complete sales agreement for 2nd tier lot ( [SA3B] ) prior to closing of this contract for purchase within one year of closing of this contract for S21 in the amount of $100,000."
The October 2nd contract was subject to the terms of the Association's deed restrictions which include the following provision:
[n]o sale, contract to sell, or conveyance of the real estate herein described shall be made or consummated without first giving at least fifteen (15) days written notice to [the Association], and to the owners of the two side adjoining lots, of the proposed sale price and terms thereof; and thereupon the [Association] and/or either of the side adjoining lot owners shall have the first and prior right, option, and privilege during said period of fifteen (15) days to buy said real estate at the same price and upon the same terms.
In accordance with this provision, notice of sale property waivers were sent to the neighbors adjoining the S21 property on October 3, 2014. These were followed by a second set of notice of sale property waivers that were sent to the owners of the land adjoining SA3B on October 8, 2014. This second set of waivers provided notice for a proposed sale of lot SA3B to the CF Trust and stated the terms of the sale as follows: "Sale Price:100,000 ; Closing Date:prior to 10/31/15 ; Terms:as is, cash vacant lot. " (bold text computer generated, italicized text handwritten).
Richard and Hallie Pals (collectively the "Pals") owned one of the lots adjoining the SA3B property. On October 10, 2014, (two days after receiving notice of the proposed sale) the Pals, through their representative, provided verbal notice that they intended to exercise their option to purchase lot SA3B. On October 12, 2014, the joint trustees and the CF Trust executed an amendment to the October 2nd contract that eliminated the term relating to the transfer of the covered dock and declared that all four dock sites belonged exclusively to S21.[2] The existence of this amendment was never communicated to the Pals or any other neighbors entitled to notice under the Association's deed restrictions. On October 14, 2014, the Pals formally reduced to writing the previously communicated *566 decision to exercise their option to purchase the SA3B property by signing the appropriate section of the notice of sale property waiver sent to them on October 8th, which they then delivered to the joint trustees.[3]
On October 16, 2014, (two days after the Pals formally exercised their option to purchase the SA3B property on the terms of the October 2nd contract) two trustees of the LD Trust entered into a new contract ("the October 16th contract") to sell lot SA3B to the CF Trust for $100,000.00 with closing to occur on or before October 30, 2015.[4] This new contract specifically stated the property came with no dock rights.
On October 30, 2015, the day the sale of lot SA3B was scheduled to close, the Pals were presented with an amendment that the joint trustees purported to relate back to the October 16th contract. The joint trustees intended to use this amendment, in combination with the October 16th contract itself, as the terms for closing on the sale. Among other things, this amendment proposed to replace the CF Trust with the Pals as the purchasers of lot SA3B and introduced a new term that stated "[a]ll parties understand the same terms of the original contract apply including no dock as stated in the contract and sold as is." In addition, the Pals were also presented with a new notice of sale property waiver for the SA3B property, which was identical to the one sent to them on October 8, 2014, except for the Pals being listed as the purchasers instead of the CF Trust. The Pals protested both of these documents claiming that they intended to close on the terms of the October 2nd contract. However, after being told that representatives of the CF Trust were present and prepared to close on the terms of the October 16th contract if the Pals failed to sign the documents presented (and would file suit should the Pals seek to prevent them from closing), the Pals signed both the amendment and the new notice of sale property waiver. The Pals maintain that they were prevented from making any changes to the two documents and claim they signed under duress.
On October 15, 2015, a little over two weeks before the sale of SA3B closed, the CF Trust filed a declaratory judgment action in the Circuit Court of Jackson County, Missouri, against the DFL Trust, the joint trustees, Stephen W. Crider, and the Estate of Lester Dean, who was by then deceased, seeking a declaration that lot SA3B retained no rights to any of the four docks associated with the S21 property that by then had been purchased by the CF Trust.[5] A month later, on November 12, the Pals filed an action against the trustee of the CF Trust, the joint trustees, and the Association seeking a judgment declaring that the rights to the covered dock referenced in the October 2nd Contract be transferred to them upon improvements being made to lot SA3B and an order for specific performance of the same.[6] These two cases were consolidated in February of 2016. The CF trust subsequently filed an amended petition naming as defendants the DFL Trust, the LD
*567 Trust, the joint trustees, and Stephen W. Crider. This was followed by a third amended petition in which they added the Pals as a defendant and introduced a claim against them for abuse of process. The CF Trust and the joint trustees thereafter moved for summary judgment.
The trial court entered summary judgment in favor of the CF Trust on August 31, 2017. After the Pals noted that two judgments were necessary based on the cases having been consolidated, the trial court entered separate judgments in favor of the CF Trust and the joint trustees. In both cases, the trial court certified the issue as ripe for appeal under Rule 74.01.[7] The Pals now appeal.
Standard of Review
"Summary judgment is appropriate when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." Doe Run Resources Corp. v. American Guarantee & Liability Insurance , 531 S.W.3d 508, 511 (Mo.banc 2017). "The propriety of summary judgment is purely an issue of law" and "our review is essentially de novo. " ITT Commercial Finance Corp. v. Mid-America Marine Supply Corp. , 854 S.W.2d 371, 376 (Mo.banc 1993). We evaluate the record, and all reasonable inferences, in the light most favorable to the party against whom judgment was entered. Id. "Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion." Id.
Analysis
The Pals's sole point on appeal contends that the trial court misapplied the law in entering summary judgment in favor of the CF Trust and the joint trustees. Specifically, the Pals maintain that the October 2nd contract established an enforceable agreement for the sale of the SA3B property, which included a provision regarding the transfer of dock rights upon improvements being made to the property. They further assert that, because the Association's deed restrictions provided adjacent neighbors of a parcel being sold an option to purchase "upon the same terms " as the proposed buyer, their exercise of that option entitled them to enforce the dock transfer provision of the October 2nd contract regardless of whether the sellers included that provision in the notice of sale property waiver sent on October 8th. Finally, the Pals argue that neither the purported amendment of October 12, 2014, nor the documents they signed on October 30, 2015, invalidated their claim as the former was an ineffective attempt to modify an *568 irrevocable option to purchase the property and the latter were signed under duress.
A. Validity of the October 2, 2014 Contract
Before we can address the effects of the amendment made on October 12th or the language of the two notice of sale property waivers and the October 30, 2015, amendment signed by the Pals, we must first determine whether the October 2nd contract did indeed constitute an agreement for the sale of the SA3B property. Missouri law clearly states that the essential elements of any contract are offer, acceptance, and bargained for consideration. Baker v. Bristol Care, Inc. , 450 S.W.3d 770, 774 (Mo.banc 2014).[8] In this case, there is no real dispute that the October 2nd contract met all three of these requirements. Indeed, the sale of the S21 property was consummated on the terms of this contract and none of the parties now argue that the contract was unenforceable with regard to the sale of that property. Further, an examination of the specific language from the October 2nd contract regarding the sale of the SA3B property-which was clearly offered and accepted by the parties-demonstrates the existence of consideration for that particular transaction in the form of a promise to pay $100,000.00. Therefore, the October 2nd contract meets all the requirements necessary to constitute a contract for sale of the SA3B property.
While the CF Trust appears to concede that the October 2nd contract contained an enforceable agreement for the sale of the SA3B property, the joint trustees attempt to avoid this conclusion by arguing that the "seller" listed in the October 2nd contract had no legal authority to contract for the sale of SA3B because the two parcels belonged to separate trusts. However, this argument is unpersuasive given that the October 2nd contract was not executed in the name of either trust, but rather, by the joint trustees themselves. Moreover, because the joint trustees were trustees of both the DFL Trust and the LD Trust, they possessed the legal capacity to enter into contracts for the sale of both parcels. See Thompson v. Koenen , 396 S.W.3d 429, 435 (Mo. App. W.D. 2013) ("The trustee is the legal owner of the trust property, in which the beneficiaries have equitable ownership."); US Bank, N.A. v. Smith , 470 S.W.3d 17, 28 n. 4 (Mo. App. W.D. 2015) (stating same). In addition, the joint trustees' position is contradicted by their own actions regarding the October 2nd contract. First, it was the joint trustees who drafted the October 2nd contract, including the language they now claim to be unenforceable. Thus, their argument relies on establishing the invalidity of their own work. Second, the joint trustees were the ones responsible for sending the notice of sale property waivers to the owners of the lots neighboring the SA3B property on October 8, 2014. There is no reason that the joint trustees would have taken such action unless they believed at the time that the October 2nd contract did form a valid agreement for the sale of the SA3B property, thus triggering their notice obligation under the Association's deed restrictions. That belief was correct. Consequently, we reject the argument raised by the joint trustees and find that the October 2nd contract created an enforceable agreement for the sale of the SA3B property.
B. Effect of the October 12, 2014, Amendment *569 Having determined that the October 2nd contract created an enforceable agreement for the sale of the SA3B property, we now turn to the question of whether the amendment executed on October 12, 2014, was effective in removing the provision concerning the transfer of dock rights. The Pals argue that the amendment was of no legal consequence because it was made within the fifteen-day window established in the Association's deed restrictions during which they possessed an option to purchase the property under the terms of the October 2nd contract that was not subject to withdrawal or modification. The CF Trust contends that the Pals misunderstand the difference between an option contract (which prohibits withdrawal or modification) and a right of first refusal (which would permit the modification of the contract) and that the Pals only possessed the latter with regard to the October 2nd contract. While the CF Trust is correct that an option contract and a right of first refusal are distinct legal concepts, their argument that the Pals did not possess an option to purchase the SA3B property is erroneous.
As this court laid out in Anderson v. Parker , "A true option creates in the optionee a power to compel the owner of property to sell it at a stipulated price whether or not he is willing to part with ownership." Anderson v. Parker , 351 S.W.3d 827, 831 (Mo.App. W.D. 2011) (quoting Hensley-O'Neal v. Metro. Nat'l Bank , 297 S.W.3d 610, 614 (Mo.App. S.D. 2009) ). "A preemptive right, on the other hand, 'gives a prospective purchaser the right to decide whether to buy the property before all others should the seller decide to sell .' " Hensley-O'Neal , 297 S.W.3d at 614 (emphasis added) (quoting Venture Stores, Inc. v. Pacific Beach Co. Inc. , 980 S.W.2d 176, 184 (Mo.App. W.D. 1998) ). As a result, several courts have described the right of first refusal as "a conditional option under which the pre-emptioner has the right to purchase subject to some condition, the condition being generally (despite variation in phraseology) that the owner must first arrive at a decision to sell." McNabb v. Barrett , 257 S.W.3d 166, 170 (Mo.App. W.D. 2008) (quoting Blue Ridge Bank & Trust Co. v. Trosen , 221 S.W.3d 451, 460-61 (Mo.App. W.D. 2007) ); see also Gilmore v. Letcher , 508 S.W.2d 257, 262 (Mo.App. 1974) (stating same). Once the owner decides to sell, however, the preemptive right "ripens into a full option ." McNabb , 257 S.W.3d at 170 (emphasis added); see also Trosen , 221 S.W.3d at 461 ; Gilmore , 508 S.W.2d at 262 ; Anderson , 351 S.W.3d at 831.
In this case, the Association's deed restrictions gave the Pals a right of first refusal regarding the SA3B property based on their ownership of an adjoining lot. Because they possessed only a right of first refusal, they could not have compelled the joint trustees to sell the SA3B property or otherwise dictated the terms of any potential sale. Anderson , 351 S.W.3d at 831 ("The person holding the right of first refusal or preemption cannot compel an unwilling seller to sell." (quoting Jewish Ctr. for Aged v. BSPM Trustees, Inc. , 295 S.W.3d 513, 519 (Mo.App. E.D. 2009) ) ). However, once the joint trustees made the decision to sell by entering into the contract with the CF Trust on October 2nd and sent out the notice of sale waiver on October 8th, the Pals right of first refusal "ripen[ed] into a full option." McNabb , 257 S.W.3d at 170 ; Trosen , 221 S.W.3d at 461 ; Gilmore , 508 S.W.2d at 262 ; Anderson , 351 S.W.3d at 831. As such, once the notice of sale property waivers were sent, the Pals possessed an option to purchase the SA3B property and the joint trustees were prohibited from withdrawing or modifying that option in any way for fifteen days. HGS Homes, Inc. v. Kelly Residential Group, Inc. , 948 S.W.2d 251, 255 (Mo.App. E.D. 1997) ("An option consists of a continuing and irrevocable offer which the *570 optionor cannot withdraw during a stated period."). Therefore, the amendment signed on October 12, 2014, was invalid and had no effect on the Pals' ability to execute the option to purchase the SA3B property on the terms contained in the October 2nd contract.[9]
C. Content of the Notice of Sale Property Waiver
We next consider the effect the terms listed (or rather not listed) in the notice of sale property waiver sent on October 8th had on the Pals' acceptance. The joint trustees and the CF Trust both take the position that, because the notice of sale property waiver did not include the transfer of dock rights provision contained in the October 2nd contract and instead stated that the lot was being sold "as is vacant lot," the Pals were constructively on notice that they were not receiving any dock rights. We disagree. First, with regard to the term "as is," both statute and case law make clear that this language constitutes nothing more than an express denial of all warranties that might otherwise attach to the sale of a parcel of real estate. See Missouri Revised Statutes § 400.2-316(3)(a) ("[U]nless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is', 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty."); Harper v. Calvert , 687 S.W.2d 227, 230 (Mo.App. W.D. 1984) ("The term 'as is' is not ambiguous" "as a matter of law, [it] means that all implied warranties are excluded."). Similarly, the description of the property as a "vacant lot" tells nothing regarding whether there does or does not exist conditional terms relating to the transfer of dock rights and is instead simply a description of the property. Consequently, the use of these two terms in the notice of sale property waiver has no relevance to whether the Pals' agreement to purchase lot SA3B included dock rights.
The only remaining argument raised by the joint trustees and the CF Trust regarding the October 8th notice of sale property waiver is the claim that, because the waiver did not include the transfer of dock rights provision and the Pals readily concede that they had not *571 seen the October 2nd contract before exercising their option on October 14th, the Pals should not be permitted to enforce that term. In essence, the joint trustees and the CF Trust argue that the failure of the joint trustees to provide the Pals with a notice of sale property waiver that included all terms listed in the underlying contract (which itself is a contravention of the requirements of the Association's deed restrictions) limited the Pals to enforcing only those terms that they were actually aware of at the time they accepted the offer. However, the Association's deed restrictions clearly state that the Pals option to purchase the SA3B property was to be "upon the same terms" as those agreed to by the CF Trust and joint trustees. That provision of the Association's deed restrictions was quoted in the notice of sale property waiver itself, meaning that at the time the Pals exercised their option to purchase, they were on notice that they would be purchasing "upon the same terms" as the proposed sale to the CF Trust. Moreover, as we have previously established, the "terms" for sale of the SA3B property to the CF Trust were those found in the October 2nd contract, which was the only contract in existence at the time the notice of sale property waivers were sent out.[10] Under the facts of this case, by exercising their option to purchase on October 14th, the Pals established a bilateral contract with the sellers on the same terms as those contained in the October 2nd contract, which included the transfer of dock rights provision. See Riddle, ex rel. Riddle v. Elk Creek Salers, Ltd. , 52 S.W.3d 644, 646-47 (Mo.App. S.D. 2001) ("The option vests the buyer with a power of acceptance and, when the buyer accepts the offer in the prescribed manner, the option is deemed to have been exercised so as to create a binding bilateral contract."); Gilmore v. Letcher , 508 S.W.2d 257, 262 (Mo.App. 1974) ("When plaintiffs exercised their option within the 15 day period, their acceptance completed a contract of sale between plaintiffs and [defendant]. From that point forward, it was too late for [defendant] to withdraw without plaintiffs' consent."). For this reason, the failure of the notice of sale property waiver sent on October 8, 2014, to include all the terms contained in the October 2nd contract does not bar the Pals from enforcing those terms.
D. October 30, 2015 Closing and Claim of Duress
In granting summary judgment, the trial court determined the actions of the various parties in October of 2014 operated to remove the dock rights from the October 2nd agreement. As we have explained above, that conclusion was reached in error. Instead, the Pals properly executed their option to purchase the SA3B property under the terms of the October 2nd contract. The efforts of the joint trustees and CF Trust to alter those terms on October 12th and October 16th were of no legal effect. However, this does not end the analysis. The validity of the second notice of sale property waiver and contract amendment[11] signed by the Pals on October *572 30, 2015, and their impact on the terms of their purchase of the SA3B property must also be examined.
The joint trustees and the CF Trust maintain that, by signing these two documents, the Pals agreed to purchase the SA3B property without dock rights and thus waived any claim to the dock rights under the October 2nd contract. The Pals, by contrast, assert that these documents were signed under duress.[12] The Pals note that they made clear through an email sent by their legal representative on October 30, 2015, to the other parties that it was their intent to close on the terms contained in the original October 2nd contract. An attorney for the CF Trust responded that if the Pals failed to complete the closing on that day under the new terms, the CF Trust was prepared to do so and threatened legal action against the Pals for "Abuse of Process and/or Tortious Interference with a Contract" in the event they acted to prevent the CF Trust from closing on the property in their stead. The Pals assert that they were prohibited from noting on the relevant documents that they were closing on the purchase pursuant to the October 2nd contract terms or that they were signing the new notice of sale property waiver and contract amendment under protest. They argue that, based on the attendant circumstances, their execution at the closing was under duress and the documents were rendered voidable.
"It is the most basic principle of contract law that parties are bound by the terms of the contracts they sign and courts will enforce contracts according to their plain meaning, unless induced by fraud, duress, or undue influence." LaRue v. Alcorn , 389 S.W.3d 215, 218 (Mo.App. W.D. 2012) (quoting Nitro Distributing, Inc. v. Dunn , 194 S.W.3d 339, 349 (Mo.banc 2006) ). "[T]he central question with respect to duress is whether, considering all surrounding circumstances, one party to the transaction was prevented from exercising his free will by threats or wrongful conduct of the other." Slone v. Purina Mills, Inc. , 927 S.W.2d 358, 370-71 (Mo. App. W.D. 1996). As noted in the Restatement (Second) of Contracts, threats capable of constituting duress include situations where "what is threatened is the use of civil process and the threat is made in bad faith, or the threat is a breach of the duty of good faith and fair dealing under a contract with the recipient." Restatement (Second) of Contracts § 176(1)(c),(d) (Am. Law Inst. 1981); see also Aurora Bank v. Hamlin , 609 S.W.2d 486, 488 (Mo.App. S.D. 1980) ("Threats to take legal action [with] knowledge of the falsity of the claim can amount to duress.").
Since the trial court's grant of summary judgment was founded on a determination that the transfer of dock rights provision contained in the October 2nd contract was not a term of the agreement accepted by the Pals through exercise of their option *573 based on a combination of factors, including the content of the original notice of sale property waiver and the October 12th amendment (between the joint trustees and the CF Trust), it never reached the duress allegations surrounding the parties' conduct of October 30, 2015.[13] As explained above, the terms of the October 2nd contract (including the provision regarding transfer of dock rights) governed the option exercised by the Pals. In those circumstances, the Pals' allegations that the joint trustees refused to close the sale of the SA3B property on the terms of the October 2nd contract, and that litigation was threatened if the Pals attempted to assert their rights under the October 2nd contract, present genuine issues of material fact which cannot be resolved on summary judgment.
Conclusion
The judgment of the trial court is reversed and the cause is remanded for further proceedings consistent with this opinion.
All concur.

The facts herein presented are stated in the light most favorable to the party against whom judgment was entered with the non-moving party receiving the benefit of all reasonable inferences. Soybean Merchandising Council v. AgBorn Genetics, LLC , 534 S.W.3d 822, 828 (Mo. App. W.D. 2017).

The amendment erroneously refers to the October 2nd contract as having been finalized on October 3rd.

Another neighbor, Debra Hahn ("Hahn"), who also owned property adjoining lot SA3B chose to exercise her option to purchase the lot as well. The Pals and Hahn ultimately agreed to divide ownership of lot SA3B, with the Pals taking 74.87% and Hahn claiming the remaining 25.13%. Hahn was not made a party to the underlying lawsuit and hence is not a party to this appeal.

The October 16th contract listed the sellers as Lorelei M. Dean and Stephen W. Crider, who is an additional trustee of the LD Trust.

The deal to purchase lot S21 closed on October 31, 2014, at which point the CF Trust took possession of the property.

The Association was later voluntarily dismissed.

In order for a judgment to be final and appealable, it "normally must resolve all issues, leaving nothing for future determination." Kinney v. Schneider National Carriers, Inc. , 213 S.W.3d 179, 182 (Mo.App. W.D. 2007). However, where there are multiple claims or parties, Supreme Court Rule 74.01(b) permits the trial court to certify a partial judgment as final if it determines that there is no just reason for delay. Id. Even so, such a designation is only considered effective "when the order disposes of a distinct 'judicial unit.' " Gibson v. Brewer , 952 S.W.2d 239, 244 (Mo.banc 1997). The concept of a "judicial unit" in this context "has a settled meaning: 'the final judgment on a claim, and not a ruling on some of several issues arising out of the same transaction or occurrence which does not dispose of the claim.' " Id. (quoting State ex rel. State Hwy. Comm'n v. Smith , 303 S.W.2d 120, 123 (Mo. 1957) ). In this case, the trial court's grant of partial summary judgment did resolve a distinct "judicial unit," as it disposed entirely of the Pals's claims for specific performance and declaratory judgment leaving behind only the CF Trust's claim for abuse of process. Thus, the order was properly certified as having "no just reason for delay," and this court has jurisdiction to review the dismissal. See Kinney , 213 S.W.3d at 182.

"Consideration 'consists either of a promise (to do or refrain from doing something) or the transfer or giving up of something of value to the other party.' " Baker v. Bristol Care, Inc. , 450 S.W.3d 770, 774 (Mo.banc 2014) (quoting Morrow v. Hallmark Cards, Inc. , 273 S.W.3d 15, 25 (Mo.App. W.D. 2008) ).

The CF Trust attempts to argue that, even if the Pal's right of first refusal did ripen into an option once the joint trustees made the decision to sell by entering into the October 2nd contract, that option was still subject to modification or revocation during the time period for which it existed. In addition to being inconsistent with prior precedent cited in this opinion, the CF Trust's argument, if true, would fundamentally undermine the primary purpose of the deed restriction. Under the CF Trust's theory, the property owner could enter into a contract for the sale of the land, thus triggering the option, and, if the party possessing the preemptive right suggested that they intended to exercise that right, the property owner could revoke and modify the contract as many times as needed to make it unpalatable to the party possessing the right. This would in effect render the deed restriction meaningless. Further, even if we were to accept the CF Trust's argument that the offer to sell lot SA3B was capable of being revoked or modified, their argument that the amendment signed on October 12th was effective in doing so would still fail. The CF Trust acknowledges in its brief that an offeree must notify the recipient of an offer that the offer is being revoked in order for the revocation to be effective. See Woods ex rel. Woods v. Cory , 192 S.W.3d 450, 459 (Mo.App. S.D. 2006) ("To be effective, revocation of an offer must be communicated to the offeree before he has accepted." (quoting Hendricks v. Behee , 786 S.W.2d 610, 612 (Mo.App. S.D. 1990) ) ). However, the uncontroverted facts demonstrate that neither the joint trustees nor the CF Trust communicated the existence of the October 12th amendment to the Pals at any time prior to the Pals delivering their acceptance on October 14th. Therefore, the October 12th amendment would not have been a valid modification of the contract even if modification of the contract was permitted.

We reject the argument made by the joint trustees and the CF Trust that the notice of sale property waivers could themselves have constituted a contract for the sale of the SA3B property. Among the host of issues with such a claim is the simple fact that the notices are not signed by the owners of the property being sold. Instead, the notice of sale property waivers by their very nature presuppose the existence of some other contract or agreement for the sale of the property in question, which, in this case, would be the October 2nd contract.

The amendment references an effective date of the underlying contract as October 24, 2014. There does not appear to be any contract of that date relevant to this property or involving any party associated with this transaction. The legal relevance of this discrepancy will need to be addressed by the trial court on remand.

The CF Trust argues that the Pals have failed to preserve their argument for review because "nowhere in their response to the [DFL Trust]'s motion for summary judgment did the Pals ever argue that the [SA3B] Addendum was void or voidable for any reason, either let alone due to duress, threat, or coercion." However, the Court notes that the Pals response to the DFL Trust's motion for summary judgment specifically states: "In light of their clearly stated intention and the refusal of the closing agents to allow them to register their protest to the incorrect documents [ ], the Pals went forward with the closing on October 30, 2015, due to the duress exerted by Plaintiff Costello at that time." Further, this assertion is supported by the necessary citation to the factual record. As such, we find that the Pals argument concerning duress was preserved.

Although the trial court's judgment makes brief reference to the notice of sale property waiver and contract amendment executed on October 30, 2015, those documents do not appear to have been part of the trial court's substantive analysis and were simply referenced to provide confirmation to its conclusion that the transfer of dock rights was not a term of the agreement the Pals accepted when they exercised their option to purchase on October 14, 2014.